No. 2023-2245

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## JILIN FOREST INDUSTRY JINQIAO FLOORING GROUP CO., LTD.,
*Plaintiff-Appellee*

**v.**

## UNITED STATES,
*Defendant-Appellant*

---

Appeal from the United States Court of International Trade in No. 1:18-cv-00191-RKE, Senior Judge Richard K. Eaton

---

## OPENING BRIEF FOR DEFENDANT-APPELLANT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

COUNSEL:

Rachel Bogdan
Senior Attorney
Office of the Chief Counsel
for Trade Enforcement and
Compliance
U.S. Department of Commerce
Washington, D.C.

Dated January 18, 2024

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

BRENDAN D. JORDAN
Trial Attorney
Civil Division, Department of Justice

*Attorneys for Defendant-Appellant*

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ....................................................................1

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF THE ISSUE..............................................................................1

STATEMENT OF THE CASE................................................................................2

I.      Nature Of The Case .................................................................................2

II.     Legal And Regulatory Framework ..........................................................2

III.    Statement Of Facts And Course Of Proceedings Below ..........................6

        A.      Administrative Proceedings Before Commerce.................................6

        B.      Proceedings Before The Court Of International Trade.........................9

                1.  The Trial Court's First Remand Order (*Jilin I*) .............................9

                2.  Remand Proceedings And This Court's Decision In *China
                    Manufacturer's Alliance v. United States* ......................................10

                3.  *Jilin II* ........................................................................................15

SUMMARY OF ARGUMENT ..............................................................................17

ARGUMENT ........................................................................................................18

I.      Standard Of Review................................................................................18

II.     The Trial Court's Decision Is Not Supported By The Antidumping
        Statute And Conflicts With Binding Precedent, Including *CMA* ................19

        A.      Commerce's Application Of The China-Wide Rate Is Consistent
                With The Antidumping Statute ..........................................................19

B.    The CIT's Decision Is Contrary To Binding Precedent That Has Repeatedly Affirmed Commerce's NME Policy ................................. 25

C.    Commerce Rationally Assigned Jilin The China-Wide Rate ............. 29

1.    Commerce's Decision To Apply Its NME Policy To Jilin Is Rational And Supported By Substantial Evidence ....................... 29

2.    Substantial Evidence Supports Commerce's Finding That Jilin Is Controlled By The Chinese Government ....................................... 31

D.    Substantial Evidence Supports Commerce's Conclusion That Jilin Is Part Of The China-Wide Entity ............................................................ 32

CONCLUSION ................................................................................................ 34

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bankers Tr. New York Corp. v. United States*,
   225 F.3d 1368 (Fed. Cir. 2000) ...........................................................................27

*Baroque Timber Indus. (Zhongshan) Co. v. United States*,
   971 F. Supp. 2d 1333 (Ct. Int'l Trade 2014).......................................................7

*China Manufacturers Alliance, LLC v. United States,* (*CMA*),
   1 F.4th 1028 (Fed. Cir. 2021) ........................................................ *passim*

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) .........................................................................31

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) .........................................................................19

*Diamond Sawblades Manufacturers Coalition v. United States*,
   866 F.3d 1304 (Fed. Cir. 2017) ..................................................... *passim*

*Dupont Teijin Films USA, LP v. United States*,
   407 F.3d 1211 (Fed. Cir. 2005) .........................................................18

*E.E.O.C. v. Trabucco*,
   791 F.2d 1 (1st Cir. 1986) ................................................................28

*ICC Indus., Inc. v. United States*,
   812 F.2d 694 (Fed. Cir. 1987) ......................................................4, 23

*Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*,
   519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021)............................... *passim*

*Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United S*tates,
   617 F. Supp. 3d 1343 (Ct. Int'l Trade 2023)............................... *passim*

*Matsushita Elec. Indus. Co. v. United States*,
   750 F.2d 927 (Fed. Cir. 1984) ...........................................................19

*Mendenhall v. Cedarapids, Inc.*,
  5 F.3d 1557 (Fed. Cir. 1993) .................................................28

*Michaels Stores, Inc. v. United States*,
  766 F.3d 1388 (Fed. Cir. 2014) ...........................................25

*Microstrategy Inc. v. Business Objects, S.A*,
  429 F.3d 1344 (Fed. Cir. 2005) ...........................................32

*Payne v. Tennessee*,
  501 U.S. 808 (1991) ............................................................28

*Pokarna Engineered Stone Ltd. v. United States*,
  56 F.4th 1345 (Fed. Cir. 2023) ...........................................30

*Qingdao Taifa Grp. Co. v. United States*,
  637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ...................4, 23

*Sigma Corp. v. United States*,
  117 F.3d 1401 (Fed. Cir. 1997) .................................. *passim*

*SKF USA, Inc. v. United States*,
  512 F.3d 1326 (Fed. Cir. 2008) ...........................................29

*SNR Roulements v. United States*,
  402 F.3d 1358 (Fed. Cir. 2005) ...........................................18

*Strickland v. United States*,
  423 F.3d 1335 (Fed. Cir. 2005) ...........................................28

*Transcom, Inc. v. United States*,
  294 F.3d 1371 (Fed. Cir. 2002) ....................................25, 26

*United States Steel Corp. v. United States*,
  621 F.3d 1351 (Fed. Cir. 2010) ...........................................20

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) .....................................................19, 20

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) .....................................................18, 19

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ...................................................24

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    783 F. Supp. 2d 1343 (CIT 2011) .............................................24

*Zhejiang Machinery Import & Export Corp. v. United States*,
    65 F.4th 1364 (Fed. Cir. 2023) ................................................33

**Statutes**

19 U.S.C. § 1673 ...........................................................................3

19 U.S.C. § 1673a ..........................................................................3

19 U.S.C. § 1673d ................................................................ *passim*

19 U.S.C. § 1675(a)(1)(B) ............................................................5

19 U.S.C. § 1677b ................................................... 3, 4, 13, 30

19 U.S.C. § 1677e ......................................................................6, 7

19 U.S.C. § 1677f-1 .............................................................. *passim*

19 U.S.C. § 1677(18) ................................................... 4, 13, 30

19 U.S.C. § 1677(34) ....................................................................3

28 U.S.C. § 1295(a)(5) ..................................................................1

28 U.S.C. § 1581(c) ......................................................................1

28 U.S.C. § 2639(a)(1) ................................................................19

**Regulations**

19 C.F.R. Part 207 ........................................................................3

19 C.F.R. § 351.107 ................................................. 5, 13, 14, 30

19 C.F.R. § 351.205(a) ..................................................................3

19 C.F.R. § 351.210(a) ..................................................................3

# Other Authorities

*Antidumping Duties; Countervailing Duties*,
    61 FR 7308(February 27, 1996) ...........................................................................18

*STARE DECISIS*,
    Black's Law Dictionary (11th ed. 2019) ............................................................27

## STATEMENT OF RELATED CASES

Pursuant to Rule 47.5, defendant-appellant's counsel states that he is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title.

Defendant-appellant's counsel is also unaware of any cases currently pending before this Court or any other court that may directly affect or be directly affected by the Court's decision in this case.

## JURISDICTIONAL STATEMENT

The United States Court of International Trade (CIT or trial court) possessed jurisdiction pursuant to 28 U.S.C. § 1581(c). This Court possesses jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) because the CIT entered final judgment on June 9, 2023, and the United States filed its timely notice of appeal on August 1, 2023.

## STATEMENT OF THE ISSUE

For almost thirty years, the Department of Commerce has applied, and this Court has sustained, Commerce's practice of presuming that a firm from a nonmarket economy country is controlled by that country's government unless the firm rebuts the presumption of government control.

Whether the trial court erred as a matter of law when, ignoring this binding precedent, it prohibited the Department of Commerce from applying the existing

China-wide antidumping duty rate to an exporter that failed to show that it was independent from the Chinese government?

## STATEMENT OF THE CASE

### I.    Nature Of The Case

Before the trial court, Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. (Jilin) challenged the antidumping duty rate Commerce assigned to it in an administrative review of an antidumping duty order covering multilayered wood flooring from China.  Commerce determined that Jilin failed to rebut the presumption that it was controlled by the Chinese government and therefore assigned Jilin the antidumping duty rate for the China-wide entity.

The United States appeals the decisions in *Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United States*, 519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021) (*Jilin I*), Appx1-35, and *Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. United S*tates, 617 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) (*Jilin II*), Appx36-72, that set aside Commerce's application of the China-wide antidumping duty rate to Jilin.

### II.    Legal And Regulatory Framework

The Tariff Act of 1930 establishes a remedial regime to combat unfair trade practices.  Under that regime, Commerce imposes duties upon imported products that are sold—or likely to be sold—in the United States "at less than fair value" to

the detriment of a domestic industry.  19 U.S.C. §§ 1673; 1677(34).  When an

interested party files a petition on behalf of a domestic industry claiming that

imported products are being dumped, if the standards are met, Commerce initiates

an antidumping duty investigation.  19 U.S.C. § 1673a.  As part of that

investigation, Commerce calculates the "normal value" of the imported goods and

compares that price with the price at which the imported goods are sold in the

United States.  *See id*. §§ 1677(35), 1677b(a).

If Commerce finds that the goods of a foreign producer or importer are being

sold below normal value, it makes an affirmative determination of dumping.  The

United States International Trade Commission (ITC), in turn, determines whether

such dumping has "materially injured" or threatened material injury to a United

States industry.  *Id*. § 1673d(b)(1).

If Commerce makes a final determination that "the subject merchandise is

being, or is likely to be, sold in the United States at less than its fair value," and if

the ITC makes a final determination that a U.S. industry has suffered or is

threatened with material injury, Commerce issues an antidumping duty order that

imposes duties on the imports covered by the order.  *Id*. § 1673d(a)(1), (b)(1),

(c)(2); *see also* 19 C.F.R. Part 207; 19 C.F.R. §§ 351.205(a), 351.210(a).  Such an

order imposes a duty that is an amount equal to the amount by which the normal

3

value of the imported goods exceeds the export price (or the constructed export price).

Commerce uses a special nonmarket economy (NME) methodology to calculate the normal value for producers and exporters from NME countries such as China. *See* 19 U.S.C. § 1677b(c). A non-market economy country is "any foreign country that {Commerce} determines does not operate on market principles of cost or pricing structures." 19 U.S.C. § 1677(18).[1]

In antidumping proceedings involving NME countries, Commerce applies a rebuttable presumption that the export activities of all firms within the NME country are subject to government control and influence. Commerce applies a rebuttable presumption of government control to NME producers and exporters "because prices and costs are not reliable in valuing goods from {NME} countries 'in view of the level of intervention by the government in setting relative prices.'" *See Qingdao Taifa Grp. Co. v. United States*, 637 F. Supp. 2d 1231, 1243 (Ct. Int'l Trade 2009) (quoting *ICC Indus., Inc. v. United States*, 812 F.2d 694, 697 (Fed. Cir. 1987)). Typically, when Commerce determines that an exporter in a NME country has failed to demonstrate independence from state control, Commerce

---

[1] China is one of the twelve countries that Commerce currently considers as having a nonmarket economy for the purposes of Commerce's application of the U.S. antidumping and countervailing duty laws. *See* https://www.trade.gov/nme-countries-list (listing countries currently designated by Commerce as NMEs).

4

declines to conduct any further inquiry into the exporter's individual business practices. *See generally Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997).

As such, in NME proceedings Commerce uses a rate established for the country-wide entity, which it applies to all imports from an exporter that has not established its eligibility for a rate separate from the NME-entity. *See* 19 C.F.R. § 351.107(d) ("In an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."). Therefore, a single country-wide rate reflects the aggregate behavior of all the exporters of subject merchandise that failed to rebut the presumption of state control.

If requested, on a yearly basis Commerce conducts an administrative review of an antidumping duty order and calculates a new dumping duty. 19 U.S.C. § 1675(a)(1)(B). Commerce reviews and determines the amount of antidumping duties for each administrative review by determining: (1) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (2) the dumping margin for each such entry. *Id*. § 1675(a)(1)-(2).

The statute directs Commerce to determine individual weighted average dumping margins for each known exporter and producer of subject merchandise. 19 U.S.C. § l677f-1(c)(1). However, if it is not practicable to determine individual

5

weighted average dumping margins for each known exporter and producer,

Commerce may limit its examination to exporters and producers accounting for the

largest volume of merchandise from the exporting country that can be reasonably

examined (mandatory respondents).  19 U.S.C. § 1677f-l(c)(2).  Commerce may

also determine that a foreign producer or exporter has failed to cooperate with an

investigation or administrative review and apply an adverse inference.  *See* 19

U.S.C. § 1677e.

## III.   <u>Statement Of Facts And Course Of Proceedings Below</u>

### A.      <u>Administrative Proceedings Before Commerce</u>

This case involves Commerce's final results in an administrative review of the

antidumping duty order covering multilayered wood flooring from China,

*Multilayered Wood Flooring From the People's Republic of China*, 83 Fed. Reg.

35,461 (Dep't Commerce July 26, 2018) (final results), and accompanying Issues

and Decision Memorandum, Appx133.

In 2011, Commerce conducted an antidumping investigation into the sale of

certain multilayered wood flooring from China, which led to Commerce's final

affirmative determination of sales at less-than-fair value.  *Multilayered Wood*

*Flooring From the People's Republic of China*, 76 Fed. Reg. 64,318 (Dep't

Commerce Oct. 18, 2011) (final determ.).

During this investigation, Commerce found that the China-wide entity had not cooperated to the best of its ability, because several producers and exporters of multilayered wood flooring in China failed to respond to Commerce's questionnaire requesting quantity and value information. *See* final determ., 76 Fed. Reg. at 64,322. Commerce therefore imposed an antidumping duty rate based on the application of adverse facts available, pursuant to 19 U.S.C. § 1677e(b), to the country-wide entity in the investigation (the China-wide rate). Specifically, Commerce calculated the China-wide rate based on the highest calculated transaction-specific rate among the mandatory respondents in the investigation, which was 25.62 percent. *See Baroque Timber Indus. (Zhongshan) Co. v. United States*, 971 F. Supp. 2d 1333, 1339 (Ct. Int'l Trade 2014).[2]

This antidumping duty order was subject to several annual administrative reviews over the next few years. In February 2017, Commerce initiated the fifth administrative review of the order, which is the focus of this appeal. Appx73, Appx76. In the initiation notice, Commerce explained that because the review involved goods from China, a NME country, interested parties must provide evidence that their export activities are not under the control of the Chinese government to obtain a dumping rate other than the China-wide rate. *See* Appx74.

---

[2] The China-wide rate was originally calculated to be 58.84 percent, but was revised to 25.62 percent following remand proceedings for the investigation. *See Baroque Timber*, 971 F. Supp. 2d at 1338-39.

7

Commerce stated that all exporters who do not qualify for a separate rate will be deemed to be part of the single China-wide entity, which means that they would receive the China-wide rate. *Id.*

Commerce determined, pursuant to 19 U.S.C. § 1677f-1(c)(2)(B), that it was not practicable to fully investigate each of the companies for whom Commerce initiated an administrative review and selected as mandatory respondents the top two exporters of multilayered wood flooring by volume during the period of review, Jilin and Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. (Jiangsu). Appx83, Appx89.

Jilin responded to Commerce's questionnaires and cooperated with the review. In its submissions to Commerce, Jilin asserted that it was not under the control of the Chinese government and should therefore receive a rate separate from the China-wide rate. *See* Appx137.

However, Commerce concluded that Jilin failed to demonstrate *de facto* independence from the Chinese government. Commerce found that Jilin failed to rebut the presumption of government control because it was majority-owned by the Chinese government. Appx138. Commerce found that Jilin's arguments regarding the role played by a minority shareholder (a labor union) in the selection of the board of directors and management did not demonstrate that Jilin was free from government control over its export activities because the labor union itself was

8

controlled by the Chinese Communist Party.  Appx139-140.  Therefore, Commerce found that Jilin was part of the China-wide entity and assigned it the China-wide rate.  Because the China-wide entity was not under review during this segment, Commerce did not recalculate a new China-wide rate and instead applied to Jilin the 25.62 percent China-wide rate, which was previously calculated during the investigation.  *See* final results, 83 Fed. Reg. at 35,464.

## B. Proceedings Before The Court Of International Trade

### 1. The Trial Court's First Remand Order (*Jilin I*)

Jilin challenged Commerce's assignment of the China-wide rate to it in the Court of International Trade.  Appx1.  Jilin argued that it should have received a rate separate and apart from the China-wide rate for two reasons.  First, Jilin argued that it had successfully demonstrated independence from the Chinese government.  Appx2.  And second, Jilin argued that, because it was a cooperative mandatory respondent, it was statutorily entitled to an individual rate based on its own sales data.  *Id.*

On April 29, 2021, the court issued an opinion and order remanding this matter to Commerce.  *See* Appx1-35 (*Jilin I*).  The trial court reasoned that a remand was warranted because Jilin did not have a meaningful opportunity to respond to new factual information regarding Chinese Communist Party control over Jilin's labor union, which was relevant to the government control inquiry, and

that Commerce did not adequately explain the Chinese government's control over Jilin's export functions.  Appx11-12.  The court also determined that a remand was warranted in light of what it saw as Commerce's failure to justify its application of its NME policy[3] to Jilin in the final results.  The court perceived a tension between the statute's requirement that Commerce "determine the estimated weighted average dumping margin for each exporter and producer individually investigated {as a mandatory respondent}," 19 U.S.C. § 1673d(c)(1)(B)(i)(I), and the NME policy whereby Commerce automatically assigns all companies within a NME country the rate associated with the NME-entity unless the company rebuts the presumption of government control.  Appx19, Appx29-31.  The court held that Commerce failed to adequately explain how applying the NME policy to Jilin satisfied Commerce's obligation to calculate an individual rate for Jilin as a mandatory respondent.  Appx33.

### 2. Remand Proceedings And This Court's Decision In *China Manufacturer's Alliance v. United States*

In May 2021, shortly after the court issued its remand order, the United States moved to stay remand proceedings pending the final resolution of *China*

---

[3] The trial court has referred to the practice whereby Commerce assigns all companies within a NME country the rate associated with the NME-entity unless the company rebuts the presumption of government control as both the "NME policy" and the "NME presumption."  In this brief we refer to Commerce's practice as the "NME policy."

*Manufacturers Alliance, LLC v. United States* (*CMA*), 1 F.4th 1028 (Fed. Cir. 2021).  Appx149.

On June 10, 2021, this Court reversed and remanded a decision by the Court of International Trade that prohibited Commerce from applying its NME policy to a cooperative mandatory respondent.  *CMA*, 1 F.4th 1028.  In *CMA*, this Court "confirm{ed} that the resulting country-wide NME entity rate may be an 'individually investigated' rate within the meaning of 19 U.S.C. § 1673d(c)(1)(B)(i)(I), which Commerce may determine using its ordinary techniques of investigation."  *Id*. at 1039.  This Court also held that Commerce may assign the NME-wide rate to a "unitary group of exporters in an NME country that have failed to rebut the presumption of government control . . . {and that} {t}his rate may be based in whole or in part on {adverse facts available} and Commerce may carry forward an initial NME entity rate, including adverse inferences built into that rate, in subsequent administrative reviews."  *Id*. at 1039-40.  This Court further held that Commerce may permissibly apply the country-wide NME-entity rate based on adverse facts available even where an individual respondent itself is cooperative.  *Id*. (citing *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1312–15 (Fed. Cir. 2017)).

On June 16, 2021, the trial court stayed the remand proceedings and ordered the parties to address *CMA*'s impact on the issues that were remanded to

11

Commerce.  Appx153.  On July 22, 2021, following the parties' briefing on the

*CMA* decision, the trial court lifted the stay of the remand proceedings.  Appx154-

155.  In lifting the stay, the CIT declined to modify its remand instructions.  *Id*.

The court concluded that *CMA* did not answer questions related to what

Commerce's NME policy is, why its application is reasonable to Jilin, or whether

the application of the policy advances the overarching purpose of the statute to

determine accurate rates for respondents.  *See id*.

Commerce completed its remand results, where it continued to conclude that

Jilin should receive the China-wide rate.  Appx156-159.  During the remand

proceedings, Commerce provided additional information illustrating Chinese

government control over Jilin's export functions in its remand results.  Commerce,

citing information Jilin provided, explained that the Chinese government has the

ability to appoint Jilin's board of directors, which makes crucial decisions over

Jilin's export functions, including the selection of management, the setting of

export prices, the negotiation and signature of contracts and other agreements, and

decisions regarding the disposition of profits or losses.  Appx166.

Commerce also added a NME Status Report that it had relied on in the final

determination to the record during the remand.  In this NME Status Report

Commerce determined that in China, "{l}abor unions are under the control and

direction of the All-China Federation of Trade Unions (ACFTU), a government-

affiliated and {Chinese Communist Party} CCP organ." Appx167 (internal

quotation marks omitted). Commerce provided Jilin with an opportunity to

respond to this information suggesting that the labor union on its board was

controlled by the Chinese Communist Party. Appx168.[4]

Commerce further explained the NME policy and Commerce's application

of the policy to Jilin. Appx170-186. Commerce explained that it developed the

NME policy in light of the statute's recognition of the distinctions between market

economies and NMEs. Appx172-173. Commerce noted that 19 U.S.C. § 1677(18)

provides the definition of a NME and 19 U.S.C. § 1677b(c) provides special rules

for the determination of normal value if the subject merchandise is exported from a

NME. Appx172. Commerce further noted that its authority to apply a single

dumping margin applicable to all producers and exporters within a NME is

codified in a regulation that addresses "{r}ates in antidumping proceedings

involving nonmarket economy countries." Appx173 (citing 19 C.F.R. § 351.107);

*see also Antidumping Duties; Countervailing Duties*, 61 FR 7308, 7311 (February

27, 1996) ("In addition, the second sentence of the definition clarifies that in an

antidumping proceeding involving imports from a nonmarket economy ('NME')

---

[4] Commerce continued to treat China as a NME country on remand because no
party challenged China's NME status at any point during the proceedings,
including during remand. *See* 19 U.S.C. § 1677(18)(C)(i) ("Any determination
that a foreign country is a nonmarket economy country shall remain in effect until
revoked by the administering authority.").

country, the Secretary may calculate a single dumping margin applicable to all exporters and producers.  Because the government of an NME country may control export activities, the Department currently presumes that a single rate will apply, but allows individual exporters or producers to receive their own separate rates if they can demonstrate independence from the NME government.").  This regulation provides that "{i}n an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."  19 C.F.R. § 351.107.  Commerce also noted that its longstanding NME policy has received consistent judicial affirmation, given the "general statutory recognition of a 'close correlation between a nonmarket economy and government control of prices, output decisions, and the allocation of resources'" as well as Commerce's broad discretion to devise procedures to implement and enforce the statute.  *See* Appx172, Appx174 (quoting *Sigma Corp. v. United States*, 117 F.3d 1401, 1405-06 (Fed. Cir. 1997)).

Commerce further explained that its NME policy makes sense "as a matter of basic logic" because having multiple rates for what is essentially one NME-entity would be a contradiction in terms.  Appx175.  In other words, if a company is a NME state-controlled enterprise, it makes little sense to assign it a separate rate because doing so would result in the NME-entity having multiple rates, which is inconsistent with Commerce's goal to assign each entity a single rate.  Commerce

also noted that there is a sound policy rationale for its NME policy because it safeguards against a NME country using its control over a business to manipulate prices or production related to exports. Appx175, Appx182. Further, Commerce explained that applying a previously calculated NME rate to a non-independent mandatory respondent in a subsequent administrative review is justifiable in light of the broad discretion afforded to Commerce and the statute's goals of determining the same rate for all members of the same NME-wide entity to prevent potential manipulation of dumping margins and ensure accurate dumping calculations. Appx181-182. Commerce also provided detailed responses to the Court's other questions regarding its NME policy. *See generally* Appx170-191.

Because Commerce found that Jilin was controlled by the Chinese government and its NME policy was justifiable, Commerce continued to apply the NME policy to Jilin and on remand assigned it the corresponding China-wide entity rate. Appx158-159.

### 3. *Jilin II*

Jilin challenged the remand results and again argued that it was not controlled by the Chinese government and that Commerce lacked a rational basis to apply its NME policy to it. Appx36-72 (*Jilin II*). The CIT found that Commerce's "conclusion that Jilin has not rebutted the presumption of control" was supported by substantial evidence. Appx45. Thus, the CIT held that "should

15

the use of Commerce's NME presumption survive this case with respect to Jilin, its

application will not be prohibited here." *Id.*

Although the CIT affirmed Commerce's conclusion that Jilin is under the

"complete control of the Chinese government" such that Jilin failed to rebut the

presumption of Chinese government control, the court did not sustain Commerce's

assignment of the China-wide rate to Jilin.  Appx44.  The CIT found that there is

nothing in the statute that exempts Commerce from its statutory obligation to

determine the dumping margin of a "known" individually examined exporter based

on the sales data the exporter supplied in the administrative review.  Appx48.  The

CIT held that Commerce's NME policy is not entitled to deference because

Commerce did not provide a reasoned explanation for its use in the review and had

not pointed to a statutory or regulatory source permitting Commerce to use the

NME policy.  Appx69-71.  The CIT further held that the long line of authority

from this Court sustaining Commerce's use of the NME policy did not compel

sustaining Commerce's determination in this case because: (1) the agency, and not

the courts, must supply the justification for the policy to be lawful, and (2) the facts

of prior cases where this Court sustained the use of the NME policy were not

"identical" to the facts of this case.  Appx68.

On remand, Commerce calculated, under respectful protest, an individual rate

for Jilin using Jilin's own sales data.  Appx202.  On June 9, 2023, the court

sustained Commerce's second remand results and entered final judgment.

Appx222.

## SUMMARY OF ARGUMENT

This Court should reverse the trial court's holding that Commerce

unlawfully assigned Jilin an NME-wide antidumping duty rate. Since this Court's

1997 *Sigma* decision, this Court has repeatedly upheld Commerce's NME policy

whereby Commerce presumes that a respondent from a NME country is controlled

by that country's government unless the respondent comes forward with sufficient

evidence to rebut the presumption of government control. This Court recently

confirmed in *CMA* that Commerce may apply the NME-wide rate to a cooperative

mandatory respondent who fails to rebut the presumption of government control

even when the NME-rate was based on adverse facts available and that

Commerce's application of such a rate to a respondent constitutes an 'individually

investigated' rate within the meaning of 19 U.S.C. § 1673d(c)(1)(B)(i)(I). There is

no meaningful factual distinction between *CMA* and this case and the trial court

made no attempt to draw one. In light of *CMA* and this Court's other binding

precedent that has consistently affirmed Commerce's NME policy dating back to

*Sigma*, this Court should apply the doctrine of *stare decisis* and reverse the trial

court's holding, which is directly contrary to well-established and binding

precedent.

17

Further, Commerce's decision to apply its NME policy to Jilin was reasonable and supported by substantial evidence. In its remand results, Commerce explained the NME policy's function as an evidentiary presumption, the statutory and regulatory sources that support and acknowledge this policy, and the logical reasons for having such a policy. Further, substantial evidence supports Commerce's conclusion that the Chinese government controlled Jilin and Commerce reasonably explained why this fact warranted Jilin receiving the China-wide rate as opposed to a separate rate that ignores the context of Jilin's control by a NME government.

## ARGUMENT

### I.    Standard Of Review

This Court applies the same standard of review as was applied by the Court of International Trade, without deference. *Dupont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005); *SNR Roulements v. United States*, 402 F.3d 1358, 1361 (Fed. Cir. 2005). Accordingly, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence . . . or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); *Dupont Teijin*, 407 F.3d at 1215. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal*

*Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951); *accord Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).

The possibility of drawing two inconsistent conclusions from the evidence in the record does not preclude Commerce's determination from being supported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). A determination by Commerce "is presumed to be correct," 28 U.S.C. § 2639(a)(1), and "{t}he specific factual findings on which {Commerce} relies . . . are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).

## II. The Trial Court's Decision Is Not Supported By The Antidumping Statute And Conflicts With Binding Precedent, Including *CMA*

The CIT's decision is erroneous because Commerce's application of the China-wide rate to Jilin was supported by substantial evidence and in accordance with law. The trial court's finding that Commerce unlawfully applied its NME policy to Jilin is contrary to binding precedent of this Court, which has sustained Commerce's application of the China-wide rate in nearly identical situations.

### A. Commerce's Application Of The China-Wide Rate Is Consistent With The Antidumping Statute

The CIT held that by applying its NME policy to Jilin, Commerce evaded its obligation to determine an individual rate for Jilin as required by 19 U.S.C. §§ 1673d(c)(1)(B)(i) and 1677f-1(c)(1). Appx48-49. However, Commerce's

application of a single NME-entity rate to Jilin is consistent with Commerce's statutory obligation to determine dumping margins for individually investigated companies.

Although 19 U.S.C. § 1673d(c)(1)(B)(I) provides that Commerce shall "determine the estimated weighted average dumping margin for each exporter and producer individually investigated" and § 1677f-1(c)(1) provides that Commerce "shall determine the individual weighted average dumping margin for each known exporter and producer," the statute does not specify what *procedure* Commerce should use in the case of NME countries. Commerce's NME policy served as the procedure or method for determining Jilin's rate pursuant to the statute.

The statute does not prohibit the use of Commerce's NME policy as a method to determine the rate of a mandatory respondent nor does the statute say that a mandatory respondent's own sales data must be the basis for the rate it receives. Indeed, Congress has afforded Commerce wide latitude in how it enforces and implements the antidumping statute and this Court has consistently sustained Commerce's exercise of this discretion, in the absence of unambiguous statutory direction. *See United States Steel Corp. v. United States,* 621 F.3d 1351, 1361 (Fed. Cir. 2010); *Eurodif*, 555 U.S. at 316; *Sigma*, 117 F.3d at 1405 (Commerce "has broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate."). Commerce exercised its

20

discretion in choosing the NME policy as the method it would use to "determine" the dumping margin for Jilin, the investigated exporter in this case. *See* 19 U.S.C. §§ 1673d; 1677f-1.

This Court in *CMA* has recognized that Commerce's NME policy is a valid method or procedure for Commerce to make an *individual* rate determination under the statute. In *CMA*, Double Coin, an exporter of off-road tires from China, was selected as a mandatory respondent and cooperated with Commerce's administrative review. Commerce determined that Double Coin had not demonstrated independence from the Chinese government and assigned Double Coin the rate assigned to the China-wide entity, which was a previously calculated rate. Double Coin argued that in using the previously-assigned China-wide rate, it did not receive an individual rate as required by 19 U.S.C. § 1673d(c)(1)(B)(i).

This Court disagreed, holding that "{t}he {China}-wide entity rate resulting from Commerce's initial investigation constitutes an 'individually investigated' weighted average dumping margin within the meaning of § 1673d(c)(1)(B)(i)(I) because 'Commerce treats the companies comprising the China-wide entity as a single entity and investigated them as such in the original investigation.'" *Id*. at 1037 (internal citations omitted). This Court also confirmed that "Commerce may carry forward an initial NME entity rate, including the adverse inferences built into that rate, in subsequent administrative reviews." *Id*. at 1037-38 (citing *Diamond*

*Sawblades*, 866 F.3d at 1314–15).

*CMA* controls this case.  In this case, Commerce determined that Jilin, who was cooperative, but nonetheless did not demonstrate independence from the Chinese government, should be assigned the China-wide rate.  The rate selected as the China-wide rate was one originally calculated in the investigation based on adverse inferences.  Commerce's decision here is no different from *CMA*, and the same result – affirmance of Commerce's decision – is required.

To require that a company receive an individual rate based exclusively on its own data simply because that company is initially selected as a mandatory respondent would undermine Commerce's longstanding practice for antidumping reviews in NME countries.  Appx138 ("It is Commerce's policy to assign all exporters of the merchandise under review that are in an NME country a single weighted-average dumping margin unless an exporter can demonstrate that it is sufficiently independent from government control so as to be entitled to a separate rate.").  Following the trial court's logic, Commerce would be required to give what amounts to a separate rate to a government-controlled company if that company is among the top exporters of subject merchandise (such that Commerce selected the company as a mandatory respondent in its respondent selection process) and requests a review, even though that company would not have qualified for a separate rate if it was not among the top exporters (and therefore not

selected as a mandatory respondent). No provision of the antidumping statute makes exporters who are selected as mandatory respondents immune from the need to demonstrate independence from state control.

Similarly, Commerce's decision to assign Jilin the China-wide rate after Jilin failed to rebut the presumption of government control does not undermine the accuracy of Jilin's rate. The CIT observed a tension between Commerce's application of a China-wide rate based on adverse facts available to Jilin, a cooperative mandatory respondent, and Commerce's duty to calculate an "accurate" rate for mandatory respondents based on the respondent's own sales data. Appx30-32. However, this incorrectly presumes that Jilin's own sales data would necessarily provide a more accurate rate for Jilin than the China-wide rate. For a company controlled by the Chinese government, assigning a rate based on a methodology that recognizes and reflects the realities of NME governmental control over a company could very well be more accurate than utilizing a method that ignores a country's NME status and is based solely on a company's individual sales data. *See Qingdao Taifa Grp. Co.*, 637 F. Supp. 2d at 1243 (noting that the statute treats NME countries differently "because prices and costs are not reliable in valuing goods from {NME} countries 'in view of the level of intervention by the government in setting relative prices.'") (quoting *ICC Indus.*, 812 F.2d at 697).

Indeed, Commerce explained that employing its NME policy would be more

23

accurate than assigning multiple different rates to entities controlled by the Chinese government because assigning multiple different rates would "allow for the potential manipulation of price or production" by the Chinese government, which wields control over each of the companies within the NME-entity. Appx174-175. Using a rate calculation method that facilitates the ability of a NME government to manipulate prices and production actually *undermines* Commerce's goals of determining an accurate weighted-average dumping margin. *Id.*

The trial court also held that because mandatory respondents serve as the basis for determining a rate for non-individually investigated separate rate respondents,[5] "calculating a rate for each respondent selected for individual examination using its own data becomes all the more important in satisfying the accuracy requirement." Appx20. As discussed above, a rate other than the China-wide rate would be less accurate for Jilin than the rate Commerce assigned it. Therefore, using this less accurate rate, not based on Commerce's NME policy, for

---

[5] The trial court referred to this as an "all-others" rate. However, Commerce does not calculate an "all-others rate" in NME proceedings, but rather looks to the "all-others rate" provision of the statute to calculate a separate rate for companies not individually examined that have rebutted the presumption of government control. *See, e.g., Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 783 F. Supp. 2d 1343, 1349 (Ct. Int'l Trade 2011) (providing that when calculating the separate rate, "Commerce normally relies on the statutory provision {that} describes the all-others rate used in market economy investigations."), *rev'd on other grounds*, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1374 (Fed. Cir. 2013).

Jilin would not promote accuracy for separate rate respondents.

Further, in determining a rate for Jilin through the NME policy, Commerce considered information Jilin provided in connection with the administrative review. Thus, Commerce's application of the NME policy did not wholesale disregard Jilin's submissions to Commerce; Commerce simply determined that the China-wide rate should be Jilin's rate because the administrative review uncovered that Jilin was controlled by the Chinese government.

## B. The CIT's Decision Is Contrary To Binding Precedent That Has Repeatedly Affirmed Commerce's NME Policy

The CIT's decision should also be reversed because it conflicts with a long line of this Court's authority, which has repeatedly upheld Commerce's decision to apply a single rate to all exporters in a NME who are unable to demonstrate independence from the government during an investigation. *See CMA*, 1 F.4th at 1036 (observing that "binding cases (too numerous to list in their entirety) have uniformly sustained Commerce's recognition of an NME-wide entity as a single exporter for purposes of assigning an antidumping rate to the individual members of the entity."); *Diamond Sawblades*, 866 F.3d at 1315; *Michaels Stores, Inc. v. United States*, 766 F.3d 1388, 1392 (Fed. Cir. 2014); *Transcom, Inc. v. United States*, 294 F.3d 1371, 1381 (Fed. Cir. 2002); *Sigma,* 117 F.3d at 1405-06. Indeed, this Court has consistently upheld Commerce's NME policy for over 26 years and counsel for defendant-appellant is unaware of any case from this Court holding

that Commerce's NME policy is unlawful.  *See Sigma*, 117 F.3d at 1405-06; *see also Transcom*, 294 F.3d at 1373 (noting that Commerce's NME Policy itself dates back to 1991).  Further, the CIT in *Jilin I* and *Jilin II* does not point to any binding precedent that undermines the legality of Commerce's NME policy.

This Court has also repeatedly sustained Commerce's authority to assign a NME-entity rate to a cooperative mandatory respondent even when the NME-entity rate was based on adverse facts available.  In *Diamond Sawblades*, this Court sustained Commerce's application of the China-wide rate, which was calculated during the investigation, to a Chinese producer that was a mandatory respondent in an administrative review.  866 F.3d at 1314-15.  This Court sustained Commerce's application of the China-wide rate to the respondent even though the respondent was cooperative during the administrative review and the China-wide rate that Commerce assigned to the respondent was based on adverse facts available.  *Id*.  This same basic fact pattern was also present in *CMA*.  The *CMA* trial court, in a decision that was ultimately reversed by this Court, attempted to distinguish *Diamond Sawblades* from *CMA* on the basis that the China-wide entity was uncooperative during both the investigation and administrative review in *Diamond Sawblades* whereas in *CMA*, the China-wide entity was only uncooperative during the investigation.  *See CMA*, 1 F.4th at 1038-39.  This Court rejected that distinction and "disagree{d} with the Trade Court that the non-

cooperation of some identified portion of the {China}-wide entity with the

administrative review on appeal was a predicate to {this Court's} decision in

*Diamond Sawblades . . .* "  *Id.* at 1035.  Thus, after *Diamond Sawblades* and *CMA*,

there can be no dispute that Commerce may carry forward the China-wide rate

based on adverse facts available to a mandatory respondent in a subsequent

administrative review if the mandatory respondent fails to rebut the presumption of

government control.

The trial court did not distinguish this case from *CMA* or *Diamond*

*Sawblades*, but instead suggested that those cases are not binding because

"holdings . . . are binding only when the facts of cases are identical" and noted that

the facts of multilayered wood flooring antidumping investigation and

administrative review are not "identical" to other cases.  Appx68.  However, the

trial court incorrectly articulated what constitutes binding precedent.  Lower courts

subject to review by this Court, such as the Court of International Trade are bound

to follow the *legal principles* that this Court decides pursuant to the doctrine of

*stare decisis*.  *See Bankers Tr. New York Corp. v. United States*, 225 F.3d 1368,

1375 (Fed. Cir. 2000) ("Once we have determined a statute's meaning, we adhere

to our ruling under the doctrine of *stare decisis*, and we assess . . . {a} later

interpretation of the statute against that settled law"); *see also* STARE DECISIS,

Black's Law Dictionary (11th ed. 2019) (defining stare decisis as "{t}he doctrine

of precedent, under which a court must follow earlier judicial decisions when the *same points* arise again in litigation") (emphasis added).

Limiting the application of *stare decisis* only to cases with *identical* facts is contrary to the doctrine's aim of promoting "the evenhanded, predictable, and consistent development of *legal principles . . .*" *Payne v. Tennessee*, 501 U.S. 808, 827 (1991) (emphasis added); *see also Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993) ("*Stare decisis* in essence 'makes each judgment a statement of the law, or precedent, binding in future cases before the same court or another court owing obedience to its decision . . . *Stare decisis* may also encompass a prior precedential decision on an issue of law which also is raised in a second case.") (internal citation omitted). Limiting *stare decisis* only to cases with *identical* facts also conflates *stare decisis* with the doctrines of *res judicata* and collateral estoppel. *See E.E.O.C. v. Trabucco*, 791 F.2d 1, 2 (1st Cir. 1986) ("*Stare decisis,* unlike the doctrines of *res judicata* and collateral estoppel, is not narrowly confined to parties and privies . . .when its application is deemed appropriate, the doctrine is broad in impact").

A trial court may "disregard its reviewing court's precedent" only "if the circuit's precedent is expressly overruled by statute or by a subsequent Supreme Court decision." *Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005). Neither exception applies here. Any apparent "disagreement" with this

28

Court's decisions. . . do not justify . . . ignoring binding precedent." *SKF USA,*

*Inc. v. United States*, 512 F.3d 1326, 1331 (Fed. Cir. 2008). Thus, *Diamond*

*Sawblades* and *CMA* control and warrant reversal of the judgment which

contravenes the legal principles articulated in these opinions.

## C. Commerce Rationally Assigned Jilin The China-Wide Rate

In the administrative review and again on remand, Commerce presumed that

Jilin was controlled by the Chinese government, afforded Jilin an opportunity to

rebut the presumption of government control, and assigned Jilin the China-wide

rate after finding that Jilin failed to rebut the presumption. This was a textbook

application of Commerce's "NME policy," which, as discussed above, is consistent

with the statute and has been repeatedly affirmed by this Court. Accordingly,

Commerce's unremarkable application of its longstanding NME policy in this case

was rational and in conformity with law, and this Court should reverse the trial

court decisions that found otherwise. However, should the court need to look

beyond the statute and its own binding precedent and look to how Commerce

applied its NME policy to Jilin, the record is clear that Commerce acted rationally

and lawfully.

### 1. Commerce's Decision To Apply Its NME Policy To Jilin Is Rational And Supported By Substantial Evidence

In its remand results Commerce provided a reasoned explanation of its NME

policy and why it is lawful. Commerce explained that the NME policy, at its heart,

is an *evidentiary* presumption and is not an exercise of statutory interpretation or a procedure that allows Commerce to avoid its statutory obligation to determine a rate for a mandatory respondent. *See* Appx173-176.[6]  Congress did not intend to insert itself into questions regarding how to weigh evidence and the NME policy functions as an exercise of Commerce's broad discretion to determine rates for mandatory respondents.  This Court has similarly acknowledged that "Commerce is justified in placing on {exporters and producers} the burden of showing a lack of state control" because they "have the best access to information pertinent to the 'state control' issue." *Sigma*, 117 F.3d at 1406.

Commerce further explained how the NME policy is logical because it helps avoids the contradictory situation where a firm controlled by a NME-entity has a different rate from the NME-entity itself.  Appx182.  Commerce also noted statutory and regulatory provisions that support or acknowledge Commerce's use of the NME policy for determining rates for companies in NME countries.  *See* Appx172-173 (citing 19 U.S.C. §§ 1677(18), 1677b(c); 19 CFR 351.107(d)).  Commerce also explained how the NME policy prevents gamesmanship by NME

---

[6] To the extent the NME policy is construed as a statutory interpretation, as opposed Commerce's manner of exercising discretion to determine rates, this Court may look to its precedent and need not perform a *Chevron* analysis. *See Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1345, 1350 (Fed. Cir. 2023) (noting that the court "need not employ a *Chevron* analysis . . . because our precedent has already interpreted" the statutory language in question).

countries by ensuring that all entities under NME-government control receive the

NME-wide rate.  Appx174-175.

Accordingly, to the extent this Court needs to look beyond the statute and its

binding precedent, the record is clear that Commerce offered "such relevant

evidence as a reasonable mind might accept as adequate to support" applying the

NME policy to Jilin, a Chinese company.  *See Consol. Edison Co. v. NLRB*, 305

U.S. 197, 229 (1938).

### 2. Substantial Evidence Supports Commerce's Finding That Jilin Is Controlled By The Chinese Government

Not only was Commerce's decision to apply the NME policy to Jilin

rational, but so was Commerce's determination that Jilin failed to rebut the

presumption of government control.  Although the trial court was broadly critical

of the NME policy as a whole, the trial court found that "should the use of

Commerce's NME presumption survive this case with respect to Jilin, its

application will not be prohibited here."  Appx45.  In other words, if Commerce is

allowed to apply its NME policy, substantial evidence supports the manner in

which Commerce applied its NME policy to Jilin on remand.  Although we

disagree with the ultimate conclusion of the trial court in *Jilin II*, which held that

Commerce could not apply its NME policy to Jilin, we do not disagree with the

trial court's subsidiary finding that Commerce rationally determined that Jilin

failed to rebut a presumption of government control.  Because we do not challenge

this aspect of *Jilin II* and Jilin has not cross-appealed, the court need not reach the issue of whether Commerce rationally determined that Jilin failed to rebut the presumption of government control. *See*, *e.g.*, *Microstrategy Inc. v. Business Objects, S.A*, 429 F.3d 1344, 1353 (Fed. Cir. 2005) ("Because {appellant} does not challenge this finding on appeal, this court need not address{it}.").

Nevertheless, even if the court does reach this issue, substantial evidence supports the conclusion that Jilin failed to rebut the presumption of government control. First, Jilin does not contest that it is majority owned by the Chinese government. Appx119. Jilin also did not challenge the findings of the NME Status Report, which concluded that labor unions in China are an appendage of the Chinese government. Appx43-45. Because the majority shareholder in Jilin is the Chinese government and the labor union minority shareholder, who controls the selection of Jilin's board members, is too controlled by the Chinese government, Commerce's determination that Jilin failed to rebut the presumption is supported by substantial evidence.

### D. Substantial Evidence Supports Commerce's Conclusion That Jilin Is Part Of The China-Wide Entity

Jilin's rate should still be sustained, regardless of whether the trial court incorrectly held Commerce's application of the NME policy was unlawful, because the evidence from the administrative review demonstrated that Jilin was fully controlled by the Chinese government. In other words, substantial evidence

32

supports Commerce's conclusion that there is Chinese government control over Jilin, which therefore warranted assigning Jilin the China-wide rate, not an individual rate based on its own sales data.  Such a determination does not necessarily turn on whether Commerce used or should have used a particular evidentiary *presumption* with respect to Jilin.

As explained above, the CIT sustained Commerce's factual determination that Jilin's export operations are *actually* under Chinese government control.  The CIT held that Commerce's review of China's labor laws and other facts in its China NME Status Report reasonably concludes that all Chinese labor unions *are controlled* by the Chinese government.  Appx43-45.  Thus, Commerce "pointed to substantial evidence demonstrating Jilin's unsupported claims that its labor union was independent cannot be credited" and, "this evidence is substantial evidence to support Commerce's conclusion that Jilin has not rebutted the presumption of state control" because the labor union appoints a majority of Jilin's board of directors which "confirms *that the state controls* the company."  Appx45 (emphasis added).

In addition, this Court recently sustained Commerce's reliance on its China NME Status Report in determining that labor unions in China are controlled by the Chinese government.  *See Zhejiang Machinery Import & Export Corp. v. United States*, 65 F.4th 1364, 1371 (Fed. Cir. 2023) (sustaining Commerce's finding that a Chinese exporter of tapered rolling bearings was subject to *de facto* government

control where a Chinese labor union was the majority shareholder of the exporter). In ordering Commerce to grant Jilin a weighted average dumping margin using its own information, the CIT's decision erroneously required Commerce to ignore that Jilin is both majority-owned by a Chinese-government entity and minority owned by a Chinese labor union, also controlled by the government.  That Commerce applied its NME policy in reaching its determination does not alter the fact that substantial – and uncontroverted – record evidence indicates that the Chinese government controls Jilin.

Therefore, to the extent Commerce's 25.62 percent rate determination for Jilin is not sustained on the basis of Commerce's lawful application of its NME policy, the judgment should still be reversed because the record establishes actual Chinese government control over Jilin's export functions independent of any evidentiary presumption.

## **CONCLUSION**

For these reasons, we respectfully request that this Court reverse the trial court's holding that Commerce unlawfully assigned Jilin a 25.62 percent antidumping duty rate and remand this matter to the trial court with an instruction to sustain the 25.62 percent antidumping duty rate Commerce assigned to Jilin.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Of Counsel:                                           Director

                                                      /s/ Tara K. Hogan
Rachel Bogdan                                         TARA K. HOGAN
Senior Attorney                                       Assistant Director
Office of the Chief Counsel
for Trade Enforcement and Compliance                  /s/ Brendan D. Jordan
U.S. Department of Commerce                           BRENDAN D. JORDAN
Washington, D.C.                                      Trial Attorney
                                                      Commercial Litigation Branch
                                                      Civil Division
                                                      Department of Justice
                                                      P.O. Box 480
                                                      Ben Franklin Station
                                                      Washington, D.C.  20044
                                                      Telephone: (202) 616-0342
                                                      Email: Brendan.d.jordan@usdoj.gov

January 18, 2024                                      *Attorneys for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. Procedure 32(g), this motion complies with the type-volume limitation. This brief was prepared using Microsoft Word, Times New Roman, 14-point font. In making this certification, I have relied upon the word count function of the Microsoft Word software application used to prepare this motion. According to the word count, this motion contains 7730 words.


/s/ Brendan D. Jordan