No. 2023-2245

# United States Court of Appeals for the Federal Circuit

**JILIN FOREST INDUSTRY JINQIAO FLOORING GROUP CO., LTD.,**

*Plaintiff-Appellee*

v.

**UNITED STATES,**

*Defendant-Appellant*

Appeal from the United States Court of International Trade in
No. 1:18-cv-00191- RKE, Senior Judge Richard K. Eaton

**RESPONSE BRIEF OF PLAINTIFF-APPELLEE
JILIN FOREST INDUSTRY JINQIAO FLOORING GROUP CO., LTD.,**

LIZBETH R. LEVINSON
BRITTNEY R. POWELL
FOX ROTHSCHILD LLP
2020 K STREET, NW
SUITE 500
WASHINGTON, DC 20006
PHONE: (202) 461-3100

*Counsel for Plaintiff-Appellee*

April 8, 2024

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

| | |
|---|---|
| **Case Number** | 23-2245 |
| **Short Case Caption** | Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. US |
| **Filing Party/Entity** | Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. Plaintiff-Appelle |

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/08/2024

Signature: /s/Lizbeth R. Levinson

Name: Lizbeth R. Levinson

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☑ None/Not Applicable |
| Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐  Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑     None/Not Applicable            ☐     Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)    ☑   No    ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑     None/Not Applicable            ☐     Additional pages attached

|  |  |  |
|--|--|--|
|  |  |  |
|  |  |  |

# **TABLE OF CONTENTS**

TABLE OF CONTENTS                                                                       i

TABLE OF AUTHORITIES                                                          ii-iv

STATEMENT OF RELATED CASES                                              1

STATEMENT OF THE ISSUE                                                        2

STATEMENT OF THE CASE                                                         2

I.      NATURE OF THE CASE                                                        2

II.     LEGAL AND REGULATORY FRAMEWORK                       3

III.    STATEMENT OF FACTS AND COURSE OF PROCEEDINGS
        BELOW                                                                            5

SUMMARY OF THE ARGUMENT                                                  7

ARGUMENT                                                                               14

I.      STANDARD OF REVIEW                                                     14

II.     THE DOCTRINE OF *STARE DECISIS* IS NOT APPLICABLE      15

III.    THE NME POLICY IS NOT ENTITLED TO ANY DEFERENCE      19

IV.    CONCLUSION                                                                   30

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL STATUTES

5 U.S.C. § 553 .................................................... 13, 19

5 U.S.C. § 706 .................................................... 8, 20

19 U.S.C. § 1516 .................................................. 14

19 U.S.C. § 1673 .................................................. 3, 8

19 U.S.C. § 1675 .................................................. 4

19 U.S.C. § 1677 .................................. 3, 4, 9, 24, 25, 28

### FEDERAL REGULATIONS

19 C.F.R. § 351.107(d) ........................................ 26, 27, 28

### CASES

*Avenues in Leather v. United States,*
  423 F. 3d 1326 (Fed. Cir. 2005) ........................... 17

*Brecht v. Abrahamson,*
  507 U.S. 619 (1993) ...................................... 18

*Bowen v. Georgetown University Hospital,*
  488 U.S. 204 (1988) ...................................... 25, 26

*Chevron U.S.A., Inc. v. Natural Res. Def. Council,*
  467 U.S. 837 (1984) ........................... 10, 12, 23 - 26, 29

*China Mfrs. All., LLC v. United States,*
  1 F.4th 1028 (Fed. Cir. 2021) .................... 5, 9, 10, 12

*Deckers Corp. v. United States,*
  752 F. 3d 949 (Fed. Cir. 2014) ........................... 15, 17

*Diamond Sawblades Manufacturers Coalition v. United States,*
  866 F.3d 1304 (Fed. Cir. 2017) ......... 9, 10, 13, 15 - 19, 25

*Duferco Steel, Inc. v. United States,*
  296 F.3d 1087 (Fed. Cir. 2002) .......................... 22, 25

*Fag Italia S.p.A. v. United States,*
  291 F.3d 806 (Fed. Cir. 2002) ........................... 22, 25

*Fertilizer Inst. v. EPA,*
  935 F.2d 1303 (D.C. Cir. 1991) .......................... 20

*Great Concepts, LLC v. Chutter, Inc.,*
  90 F. 4th 1333 (Fed. Cir. January 10, 2024) ............. 18

*Haig v. Agee,*
  453 U.S. 280, 296-301 (1981) ............................ 9, 20

ii

# CASES Cont'd.

*Jilin Forest Indus. Jingiao Flooring Grp. Co., Ltd. v. United States,*
  519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021)                    3, 5, 26

*Jilin Forest Indus. Jingiao Flooring Grp. Co., Ltd. v. United States,*
  617 F. Supp. 3d 1343 (Ct. Int'l Trade 2023)                    *et passim*

*Medline Indus. v. United States,*
  62 F.3d 1407 (Fed. Cir. 1995)                                  14

*Peer Bearing Co.-Changshan v. United States,*
  766 F.3d 1396 (Fed. Cir. 2023)                                 14

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States,*
  87 F.4th 1328 (Fed. Cir. 2023)                                 14

*Skidmore v. Swift & Co.,*
  323 U.S. 134 (1944)                                            10

*Sigma Corp. v. United States,*
  117 F.3d 1401 (Fed. Cir. 1997)          4, 7, 9 - 11, 13, 16, 19, 21, 24, 25,

*Superior Wire v. United States,*
  867 F.2d 1409 (Fed. Cir. 1989)                                 14

*The Container Store v. United States,*
  864 F.3d 1326 (Fed. Cir. 2017)....................             18

*Torrington Co. v. United States,*
  68 F.3d 1347 (Fed. Cir. 1995)                                  10, 21

*U.S. Telecom Ass'n v. FCC,*
  855 F. 3d 381 (D.C. Cir. 2017)                                 29

*West Virginia v. EPA,*
  597 U.S. 697 (2022)                                            29

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001)                                            29

# ADMINISTRATIVE DECISIONS

*Multilayered Wood Flooring From the People's Republic of China,*
  83 Fed. Reg. 35, 461 (Dep't Commerce July 16, 2018)            2

*Silicon Carbide From the People's Republic of China,*
  59 Fed. Reg. 22, 585 (Dep't Commerce May 2, 1994)             8

*Sparklers From the People's Republic of China,*
  56 Fed. Reg. 20, 588 (Dep't Commerce May 6, 1991)            8

# OTHER DECISIONS

*Antidumping Duties; Countervailing Duties,*
  61 Fed. Reg. at 7,311 (February 27, 1996)                      28

*Antidumping Duties; Countervailing Duties,*
  62 Fed. Reg. 27, 296, 27, 304 (Dep't Commerce May 19, 1997)    27

*Charles H. Koch, Jr., Judicial Review of Administrative Policymaking,*
    44 Wm. & Mary L. Rev. 375, 78-379 (2002)                            9, 20

*Loper Bright Enters. v. Raimondo,*
    No. 22-451 (argued Jan. 27, 2024)                                        13

*Rentless Inc. v. Dep't of Commerce,*
    No. 22-1219 (argued Jan. 27, 2024)                                       13

157146459.1

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5, Plaintiff-Appellee's counsel states that she is unaware of any other appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title. Plaintiff-Appellee's counsel is also unaware of any cases currently pending before this Court or any other court that may directly affect or be affected by the Court's decision in this appeal.

## STATEMENT OF THE ISSUE

Whether the U.S. Department of Commerce's ("Commerce") policy of applying a rebuttable presumption that the export activities of all firms within a non-market economy are subject to government control is in accordance with law given the absence of any statute or regulation or rule-making authorizing such a policy and given the fact that 19 U.S.C. § 1673d(c)(1)(B)(i)(I) expressly requires that Commerce calculate the estimated weighted-average dumping margin for each exporter and producer individually investigated.

## STATEMENT OF THE CASE

### I.    Nature of the Case

Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. ("Jilin") challenged Commerce's determination to assign Jilin, a fully cooperative mandatory respondent, the antidumping duty rate for the China-wide entity in the fifth administrative review of the antidumping duty order on multilayered wood flooring from the People's Republic of China (covering the period from December 1, 2015 through November 30, 2016).  *See Multilayered Wood Flooring From the People's Republic of China*, 83 Fed. Reg. 35,461 (Dep't Commerce July 16, 2018) ("Final Results"), and accompanying Issues and Decision Memorandum.  The Court of International Trade ("CIT") remanded the determinations to Commerce, ultimately finding Commerce failed to follow the statutory directions for

2

determining a dumping margin for mandatory respondent Jilin and failed to cite any statutory reason for not calculating an individual rate for Jilin. *Jilin Forest Indus. Jinqiao Flooring Grp. Co., Ltd. v. United States*, 519 F. Supp. 3d 1224 (Ct. Int'l Trade 2021) ("*Jilin I*") (Appx1-35), and *Jilin Forest Indus. Jinqiao Flooring Grp. Co., Ltd. v. United States*, 617 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) ("*Jilin II*") (Appx36-72). The United States now appeals the CIT's decisions in *Jilin I* and *Jilin II*.

## II.    <u>Legal and Regulatory Framework</u>

Jilin generally agrees with the Defendant-Appellant's (or the "Government") description of the legal and regulatory framework provided on pages 2 through the first paragraph of page 4 of the Defendant-Appellant's opening brief.  Defendant-Appellant's Br. at 2-4.  While Defendant-Appellant correctly cites relevant statutes and rules governing the antidumping duty law, notably absent is any regulatory or statutory support for the non-market economy rebuttable presumption (the "NME Policy") which Commerce has employed in the underlying administrative review. That is because the NME Policy has never been adopted by statute or codified by regulation.

The statute directs Commerce to determine an individual weighted average dumping margin for each "known" exporter and producer. 19 U.S.C. § 1677f-1(c)(1).  If Commerce determines it is not practicable to make individual

157150345.1

determinations due to the large number of exporters or producers involved in an administrative review, Commerce may limit its examination to a sample of exporters or producers.  19 U.S.C. § 1677f-1(c)(2).  In limiting its examination to a sample of exporters or producers, Commerce will select mandatory respondents for individual examination (the "mandatory respondent exception").  If an annual administrative review is requested by an interested party, Commerce reviews and determines the amount of antidumping duties for each review period by determining the normal value and export price (or constructed export price) of each entry of subject merchandise, and the dumping margin for each such entry.  19 U.S.C. § 1675(a)(1)-(2).

In antidumping proceedings concerning non-market economy countries ("NME") such as China, Commerce has been applying a rebuttable presumption that the export activities of all firms or companies within the NME country are subject to government control and influence (the "NME presumption" or "NME Policy").  Generally, Commerce declines to conduct further inquiry into an exporter's individual business practices and does not assign a calculated individual dumping margin if Commerce determines the exporter has failed to rebut the presumption (*i.e.*, demonstrate independence from state control).  *See generally Sigma Corp. v. United States,* 117 F.3d 1401, 1405-06 (Fed. Cir. 1997) ("*Sigma*").  Critically, there is no statutory or regulatory support for the NME Policy, which

157150345.1

stands as nothing more than an uncodified Department policy.  Therefore, in NME

proceedings, Commerce typically assigns the rate established for the country-wide

entity to firms that it determines have failed to rebut the presumption of

government control and influence.

### III.    Statement of Facts and Course of Proceedings Below

Jilin generally agrees with Defendant-Appellant's statement of the facts and

descriptions of the administrative proceedings before Commerce and of the

proceedings before the Court of International Trade.  Notably, the trial court stayed

the first remand proceedings (*Jilin I*) pending the final resolution of *China Mfrs.*

*All., LLC v. United States*, 1 F.4th 1028 (Fed. Cir. 2021) ("*CMA*"). The trial court

previously had instructed Commerce to show on remand that its NME Policy is in

accordance with law with respect to Jilin.  *Jilin I*, 519 F.3d at 1247, Appx37.

Specifically, if Commerce determined not to calculate an individual rate for Jilin, a

cooperative mandatory respondent, the trial judge instructed Commerce to provide

reasoned explanations for the purpose of the NME Policy, the specific statutes

Commerce construed with respect to both the NME Policy and the "mandatory

respondent exception," and any legal theories Commerce relied upon if it sought

deference for the construction of any such statute.  *See id.*, Appx34.

The trial judge ultimately concluded the questions presented and holding in

*CMA* did not address these queries in *Jilin I*, and therefore did not modify its

remand instructions. *See* Appx154-155. The trial judge found that while the Federal Circuit has found the NME Policy in conjunction with the mandatory respondent exception to be permissible in similar circumstances, *CMA* did not address the trial court's questions on remand in *Jilin I* concerning what the NME Policy actually is and whether its application was reasonable to Jilin, among other things, such as its statutory or regulatory basis. *See id.*

In its response to the trial court's questions, Commerce did not cite any statutory or regulatory basis for the NME Policy, only noting that "its longstanding NME Policy has received consistent judicial affirmation, given . . . Commerce's broad discretion to devise procedures to implement and enforce the statute." Defendant Appellant's Br. at 14. As noted by the CIT, Commerce generally stated "how the NME presumption works, but not its source." *Jilin II*, 617 F. Supp. 3d at 1362, Appx61.

Jilin challenged the remand results and in the second remand proceedings (*Jilin II*), the CIT held the NME Policy is not entitled to deference because Commerce failed to provide a reasoned explanation for its application in the underlying review. Again, the CIT noted that the Government had not identified a statutory or regulatory basis for its use. *Jilin II*, 617 F. Supp. 3d at 1367-1369, Appx69-71. In fact, the Court stated that: "[b]ecause Commerce . . . identif[ied] no statutory source for the NME presumption, the court finds that the Department has

157150345.1

conceded that there is no statutory source for the presumption." *Jilin II*, 617 F. Supp. 3d at 1356, Appx54.

The CIT also found nothing in the statute exempts Commerce from its statutory obligation to determine a dumping margin for Jilin, a "known" and cooperative individually examined respondent. *Jilin II*, 617 F. Supp. 3d at 1352, Appx48. The CIT stated: "Commerce's explanation for using its NME presumption, with respect to Jilin, is not from statute, nor from any regulation, but is merely a practice bolstered by Federal Circuit dicta that Commerce has 'broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate.'" *Jilin II*, 617 F. Supp. 3d at 1368, Appx70 (*quoting Sigma*, 117 F.3d at 1405).

## SUMMARY OF THE ARGUMENT

This Court should sustain the trial court's holding that Commerce unlawfully assigned the China-wide rate to Jilin by applying a rebuttable presumption that all companies within a non-market economy are controlled by the government of that country, *i.e.,* the "NME Policy" or the "NME Presumption." The NME Policy presumes that a respondent or firm from a non-market economy country is controlled by that country's government and thus should be part of the government-wide entity (in this case the China-wide entity) unless the respondent provides sufficient evidence to rebut the presumption of government control.

Commerce's administrative practice is to apply the punitive China-wide rate (typically adopted from the original petition in the investigation) to any respondents that fail to rebut the presumption of government control.

Commerce has applied the NME Policy for several decades now, but as noted by the CIT, it has "never identified the source in law authorizing the presumption or even given a real reason for the NME presumption's use." *Jilin II*, 617 F. Supp. 3d at 1353, Appx49. There is no statute or regulation enacting or authorizing the NME Policy. Nevertheless, Commerce has invoked this policy "to avoid an express statutory direction to calculate an individual rate for Jilin."[1] *Id.* In the absence of any statutory or regulatory authority, however, the NME Policy remains just that – a policy. An agency policy is not tantamount to a statute or regulation and is not entitled to deference under *Chevron* or any other framework.[2] The Administrative Procedure Act is clear in mandating that a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

---

[1] Commerce considers the application of the China-wide rate to a respondent as constituting an "individually investigated" rate within the meaning of 19 U.S.C. § 1673d(c)(1)(B)(i)(I).

[2] The policy itself is found in the *Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide From the People's Republic of China*, 59 Fed. Reg. 22,585 (Dep't Commerce May 2, 1994), as well as the *Final Determination of Sales at Less Than Fair Value: Sparklers From the People's Republic of China*, 56 Fed. Reg. 20,588 (Dep't Commerce May 6, 1991).

It is axiomatic that the laws of the United States, including the antidumping laws, are enacted by Congress, not by the U.S. Department of Commerce.  As noted by the CIT in *Jilin II*, "the ultimate source for the development of agency policy that affects rights must be either legislative or executive."  *Jilin II*, 617 F. Supp. 3d at 1364, Appx63-64 (*citing* Charles H. Koch, Jr., *Judicial Review of Administrative Policymaking,* 44 Wm. & Mary L. Rev. 375, 378-79 (2002); *Haig v. Agee*, 453 U.S. 280, 296-301 (1981)).  Agencies are authorized to advance their missions through a variety of agency actions, from formal rule-making procedures to informal measures.  Importantly, informal measures – such as policy statements, advisory letters, reports, etc. – do not make law.[3]

This Court has addressed the lawfulness of the NME Policy in a series of cases cited by the Government,[4] but has never squarely addressed the issue raised here - specifically, which part of the antidumping duty statute authorizes the creation of the NME Policy, especially given that the Tariff Act of 1930 (the "statute") specifically directs Commerce to determine an individual weighted

---

[3] *See* Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review: Review of District Court Decisions and Agency Actions*, Part Two, Chapter IX.B, February 2018 Updated (Thomson Reuters 2018).

[4] *See Sigma*, 117 F.3d at 1401; *Diamond Sawblades v. United States,* 866 F.3d 1304 (Fed. Cir. 2017); *CMA*, 1 F.4th at 1028.

157150345.1

average dumping margin for each "known" exporter and producer.  19 U.S.C.

§ 1677f-1(c)(1).

While the Government argues Commerce's application of the NME Policy

previously has been upheld by this Court[5] and thus constitutes binding precedent,

the doctrine of *stare decisis* is inapposite for several reasons.  Contrary to the

Government's representations, this Court has never engaged in an analysis of the

lawfulness of the NME Policy under the legal principles relied upon by the Court

below.  As the CIT has noted, this Court has never examined the NME

presumption through the lens of *Chevron* and its progeny,[6] the seminal cases

analyzing the appropriate level of deference that should be accorded to decisions of

administrative agencies.

Yet, strict and unchallenged deference to Commerce has been the dispositive

factor in the principal cases cited by the Government (*CMA, Diamond Sawblades*

and *Sigma*).[7]  In each of these cases, this Court has upheld the NME presumption

not based on any law or regulation, but based solely on Commerce's ill-defined

---

[5] *CMA*, 1 F.4th at 1039.

[6] *See Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837 (1984); *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944).

[7] *See CMA*, 1 F.4th at 1028; *Diamond Sawblades*, 866 F.3d at 1304; *Sigma*, 117 F.3d at 1326.

"broad authority."  In *Sigma*, this Court set the stage for all the Federal Circuit's

subsequent cases upholding the NME Policy by stating that:

> Commerce, however, has broad authority to interpret the
> antidumping statute and devise procedures to carry out
> the statutory mandate. *See Torrington Co. v. United
> States,* 68 F.3d 1347, 1351 (Fed. Cir. 1995).  We agree
> with the government that it was within Commerce's
> authority to employ a presumption of state control for
> exporters in a nonmarket economy, and to place the
> burden on the exporters to demonstrate an absence of
> central government control.

117 F.3d at 1401.

Subsequent cases have merely "bootstrapped" the holding in *Sigma* without

further analysis or questioning, causing the CIT to observe rightfully that the NME

presumption "is not from statute, nor from any regulations, but is merely a practice

bolstered by Federal Circuit dicta that Commerce 'has broad authority to interpret

the antidumping statute and devised procedures to carry out the statutory

mandate.'"[8]  This alleged "broad authority," however, could be relied upon to

justify virtually any action by Commerce in the antidumping realm.   Yet, it has

never been the law that this Court sanctions Commerce's unlimited authority under

the general antidumping statute.

---

[8] *Jilin II*, 617 F. Supp. 3d at 1368 (*quoting Sigma*, 117 F.3d at 1402), Appx70.

157150345.1

The Government claims this Court must uphold the lawfulness of the NME Policy based on principles of *stare decisis*.  Here, the CIT rightfully held that Commerce's NME Policy is not entitled to deference because Commerce failed to identify the statutory or regulatory source authorizing the application of the NME Policy and failed to engage in rule-making mandated by the Administrative Procedures Act ("APA").  *Jilin II*, 617 F. Supp. 3d at 1367-1368, Appx69-70.  The holding in *CMA* did not address the particular question of law at issue in this appeal – namely, whether Commerce's application of the NME Policy is entitled to deference in the absence of statutory or regulatory authority.  Indeed, *CMA* does not at all address the question of whether the NME Policy is entitled to deference under *Chevron* or any other framework, and therefore is distinguishable from the instant case.[9]  The doctrine of *stare decisis* does not insulate prior decisions from judicial review when the prior decision is unsupported by judicial or regulatory authority.

The CIT also correctly held that Commerce's application of the NME Policy is not entitled to any deference under *Chevron*.[10]  The Government has not challenged this determination or even briefed the relevance of *Chevron*.  Indeed, the *Chevron* doctrine is only applicable where the interpretation of a statute is at

---

[9] *See CMA,* 1 F.4th 1028.

[10] *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

157150345.1

issue (and therefore is not relevant here).  The Government has failed to identify a statutory or regulatory authority, a fact that clearly troubled the CIT.  *See Jilin II*, 617 F. Supp. 3d at 1361, Appx59 ("Commerce has identified no statute . . . as being the statutory source of its NME presumption and pointed to no statutory gap in any [statute] that it had the authority to fill with the NME presumption").  Having failed to invoke *Chevron*, the Government also does not identify any other reason or justification for the deference it claims is blindly due.

In the absence of statutory or regulatory authority, Commerce lacked the inherent authority to promulgate the NME presumption.  It is a fundamental principle of administrative law that an agency's authority to promulgate legislative rules (*i.e.* rules made pursuant to congressionally-delegated authority) is governed by the informal rule-making procedures outlined in the Administrative Procedures Act ("APA").  *See* 5 U.S.C. § 553.  The NME presumption and Commerce's formulation of policy governing the application of antidumping duties to a non-market economy should at a minimum be disallowed on the grounds that Commerce failed to promulgate a rule or regulation in accordance with the informal or formal rule-making requirements specified by the APA.

Remarkably, the NME Policy has reigned for over twenty years without serious legal challenge.  The time is now ripe for this Court to analyze whether the deference shown to Commerce in *CMA*, *Diamond Sawblades* and *Sigma* is

appropriate given the evolution in administrative law in the last two decades.  As the CIT aptly noted, "recent cases also suggest that the wind is blowing against wide-ranging claims for deference." *Jilin II*, 617 F. Supp. 3d at 1367, Appx69. The viability of the most seminal case on deference, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc,* has even been called into question in oral argument before the U.S. Supreme Court.[11]  In light of these developments, it is high time for this Court to re-visit and question Commerce's basis for application of the NME Policy based on the arguments set forth in the CIT decision below and in this brief.

## ARGUMENT

### I.    Standard of Review

The Federal Circuit conducts a *de novo* review of the CIT's holdings on questions of law.  "[Q]uestions of law are subject to full and independent review." *Medline Indus. v. United States*, 62 F.3d 1407, 1409 (Fed. Cir. 1995); *see also Superior Wire v. United States*, 867 F.2d 1409, 1411 (Fed. Cir. 1989).  Under 19 U.S.C. § 1516(a)(b)(1)(B), the statute's express judicial review standard, the Federal Circuit must review whether the agency's determination was unsupported by substantial evidence or was "otherwise not in accordance with law."  19 U.S.C. § 1516(a)(b)(1)(B).  This Court has stated that it "will uphold Commerce's

---

[11] *Loper Bright Enters. v. Raimondo, No. 22-451* (argued Jan. 27, 2024); *Relentless Inc. v. Dep't of Commerce, No. 22-1219* (argued Jan. 27, 2024).

157150345.1

determination unless it is unsupported by substantial evidence on the record or otherwise not in accordance with the law." *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States,* 87 F.4th 1328 (Fed. Cir. 2023) (*quoting Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399 (Fed. Cir. 2023)). Based on this standard, the CIT's decision below should be upheld because it is supported by both substantial evidence and it is otherwise in accordance with the law.

## II.    The Doctrine of *Stare Decisis* is Not Applicable

The Government relies on the doctrine of *stare decisis* to carry its case, citing to this Court's prior decisions in *Diamond Sawblades* and *CMA* as binding precedent to the present proceedings. App. Br. At 26-28. The Government relies on the doctrine of *stare decisis* in an effort to shield its uncodified NME Policy from any scrutiny. Despite these arguments, the CIT's decision in *Jilin II* does not conflict with this Court's prior determinations regarding the NME Policy. This is because *CMA* and *Diamond Sawblades* did not address the particular question of law at issue in this appeal – namely, whether Commerce's application of the NME Policy is lawful in the absence of a statute or regulation. Similarly, this Court has never explored the legal issue of whether the NME Policy is unlawful because it was not promulgated under the notice and comment requirement of the APA. The present appeal involves significant and novel issues of law that have never been squarely addressed by this Court. Contrary to the Government's argument

157150345.1

(discussed below), this Court is therefore not bound by the doctrine of *stare decisis*. *See Deckers Corp. v. United States*, 752 F.3d 949, 966 (Fed. Cir. 2014); *see Jilin II,* 617 F. Supp. 3d at 1364-1365, Appx64-65.

The Government claims two cases, *Diamond Sawblades* and *CMA*, are binding legal precedent to these proceedings, and therefore *stare decisis* binds this Court.  App. Br. at 26-29.  In *Diamond Sawblades*, this Court reviewed the application of Commerce's NME Policy and the corresponding country-wide rate, to a cooperative mandatory respondent.  *Diamond Sawblades*, 866 F.3d at 1314.  The Court sustained Commerce's application of the China-wide rate, based on its decision in *Sigma*, that Commerce has "broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate."  *Id.* at 1312 (*quoting Sigma*, 117 F.3d at 1405).

In *CMA*, the Court reviewed the application of the NME Policy and the corresponding country-wide rate to determine if the NME entity rate was an individually investigated rate within the meaning of the statute.  *CMA*, 1 F.4th at 1038-1040.  The Court held that the NME entity rate may be an individually investigated rate for fully cooperative mandatory respondents.  *Id.*  In both *CMA* and *Diamond Sawblades*, the Court relied on *Sigma* to conclude (and arguably "bootstrap" without further analysis) that Commerce has "broad authority to interpret the antidumping statute and devise procedures to carry out the statutory

16

mandate.'" *Id.* at 1038-1040 (*quoting Sigma*, 117 F.3d at 1405); *Diamond Sawblades*, 866 F.3d at 1312, 1314.

As noted by the CIT in *Jilin II,* this Court has never examined the policy through the lens of *Chevron*, the seminal case regarding the appropriate level of deference given to decisions of administrative agencies. *Jilin II*, 617 F. Supp. 3d at 1355, Appx52-53. *CMA* and *Diamond Sawblades* rely on strict and unchallenged deference to Commerce, and it is that deference to an uncodified policy, with no statutory or regulatory basis, that is being challenged in this proceeding. *CMA*, 1 F.4th at 1038-40; *Diamond Sawblades*, 866 F.3d at 1312, 1314.

In *Deckers Corp.*, this Court held that its panels are bound by the precedential decisions of prior panels under the doctrine of *stare decisis* and that such opinions could only be overturned through intervention by the Supreme Court or an *en banc* determination by the Court. *Deckers Corp.*, 752 F.3d at 964. This Court held further that *stare decisis* was limited to "only the legal determinations made in a prior precedential opinion and does not apply to either issues of fact … or issues of law that were not part of a holding in a prior decision. *Id.* at 956 (*citing Avenues in Leather v. United States*, 423 F.3d 1326, 1331 (Fed. Cir. 2005)). The Government claims that the CIT's decision incorrectly limited *stare decisis* to cases with identical facts and therefore argues for a broader application of the doctrine. App. Br. at 28.

Neither *Deckers* nor relevant Supreme Court cases support the broader application of *stare decisis* favored by the Government. The Supreme Court has stated that *stare decisis* applies only where an issue was "squarely addressed," and not where a court has "merely assumed" a legal issue. *See Brecht v. Abrahamson*, 507 U.S. 619, 620 (1993). In *Brecht*, the Supreme Court noted that while it had adopted one standard in prior opinions, *stare decisis* did not preclude it from adopting another standard in a subsequent opinion, since the Court "never squarely addressed the issue" of the first standard and was therefore "free to address the issue on the merits." *Id.* at 631. *Stare decisis* only binds the Court where a prior opinion resolved the precise issue presented in the current proceeding. *See The Container Store v. United States*, 864 F.3d 1326, 1333, note 4 (Fed. Cir. 2017); *Great Concepts, LLC v. Chutter, Inc.*, 90 F.4th 1333, 1342 (Fed. Cir. 2024) (finding that *stare decisis* did not apply because prior cases did not address the same sections of the Lanham Act that were before the Court).

Neither *Diamond Sawblades* nor *CMA* engaged in an analysis of the legal questions posed by this appeal - namely, whether the NME presumption is lawful in the absence of specific statutory or regulatory authority and in the absence of any rule-making procedures under the APA. None of this Court's prior decisions have addressed why an uncodified policy should be given more deference than the statutory provision requiring Commerce to determine the "individual weighted

18

average dumping margin for each known exporter and producer of the subject

merchandise." *See* 19 U.S.C. 1677f-1(c)(1).  Instead, these cases seem to have

"merely assumed" that Commerce has authority to adopt the NME Policy based on

*Sigma*'s finding that the Commerce has "broad authority to interpret the

antidumping statute and devise procedures to carry out the statutory mandate."

Appx70 (*quoting Sigma*, 117 F.3d at 1402).

This Court has never further analyzed whether Commerce's policy is

unlawful because it is not supported by a specific portion of the antidumping

statute or regulations, the precise issue currently before the Court.  Moreover, by

finding that the NME Policy does not carry the force of law and is not entitled to

deference because it lacks a statutory or regulatory basis, this Court will not be

failing to let its earlier decisions in *Diamond Sawblades* and *CMA* stand.  There is

simply no precedent regarding the precise legal question raised in this appeal that

binds the Court's hands.  Accordingly, the doctrine of *stare decisis* does not

prevent this Court from fully adjudicating the questions of law raised in this

appeal.

## III.    The NME Policy is Not Entitled To Any Deference

Federal agencies are delegated authority by Congress to administer

numerous federal statutes.  These agencies "literally [have] no power to act …

unless and until Congress confers powers upon [them]." *La. Pub. Serv. Comm'n v.*

157150345.1

*FCC*, 476 U.S. 355, 374 (1986). The APA requires that agencies must provide the public with adequate notice of a proposed rule followed by a meaningful opportunity to comment on the rule's content. *See* 5 U.S.C. § 553(b)-(c). As noted by the CIT in *Jilin II*, "the ultimate source for the development of agency policy that affects rights must be either legislative or executive." *Jilin II*, 617 F. Supp. 3d at 1364, Appx63-64 (*citing* Charles H. Koch, Jr., *Judicial Review of Administrative Policymaking,* 44 Wm. & Mary L. Rev. 375, 378-79 (2002); *Haig v. Agee*, 453 U.S. 280, 296-301 (1981)).

Agencies are authorized to advance their missions through a variety of agency actions, from formal rule making procedures to informal measures. While "an agency can declare its understanding of what a statute requires without providing notice-and-comment . . . an agency cannot go beyond the text of a statute and exercise its delegated powers without first providing adequate notice-and-comment." *See Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1308 (D.C. Cir. 1991). Importantly, informal measures – such as policy statements, advisory letters, reports, etc. do not make law.[12] Though agency actions can be entitled to deference, under the Administrative Procedure Act's framework for judicial review of administrative actions, a court shall "hold unlawful and set aside agency action,

---

[12] *See* Harry T. Edwards & Linda A. Elliott, *Federal Standards of Review: Review of District Court Decisions and Agency Actions*, Part Two, Cahpter IX.B, February 2018 Updated (Thomson Reuters 2018).

findings, and conclusions found to be … in excess of statutory jurisdiction, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

The Government failed to claim the level of deference to which it believes it is entitled, or to provide any kind of justification or legal source for its NME Policy. Instead, the Government's only claim of deference to its NME Policy is derived from this Court's ruling in *Sigma*, in which the Court found Commerce has broad authority to interpret the statute and devise procedures to carry it out. *Sigma*, 117 F.3d at 1401, 1405.  In *Sigma*, this Court deferred to Commerce, stating that:

> Commerce, however, has broad authority to interpret the antidumping statute and devise procedures to carry out the statutory mandate. *See Torrington Co. v. United States,* 68 F.3d 1347, 1351 (Fed. Cir. 1995). We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control.

117 F.3d 1401 (Fed. Cir. 1997).  Subsequent cases have merely "bootstrapped" the holding in *Sigma* without further analysis or question.   The CIT observed rightfully that the NME presumption "is not from statute, nor from any regulations, but is merely a practice bolstered by Federal Circuit dicta that Commerce 'has

21

broad authority to interpret the antidumping statute and devised procedures to carry out the statutory mandate.'"[13]

This alleged "broad authority to interpret the [wide-ranging] antidumping duty statute," is so expansive that it could be relied upon to justify virtually any action by Commerce in the antidumping realm, a nonsensical consequence that would eliminate any meaningful judicial review.  Yet, it has never been the law that this Court sanctions Commerce's unlimited authority under the general antidumping statute.  In fact, this Court has not hesitated to circumscribe Commerce's authority where appropriate.  *See Fag Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002) (the fact that the statute does not explicitly prohibit or deny Commerce the authority to conduct a duty absorption inquiry does not give it authority to do so, and the statutory provisions governing annual reviews for Commerce do not confer general authority that might include the power to consider duty absorption); *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002) (the Court of Appeals grants significant deference to Commerce's own interpretation of the scope of antidumping duty and countervailing duty orders; however, Commerce cannot interpret an antidumping

---

[13] *Jilin II,* 617 F. Supp. 3d 1368 (*quoting Sigma*, 117 F.3d at 1402), Appx70.

order so as to change its scope, nor can it interpret it in any manner contrary to its

terms).

Under *Chevron* and its progeny, an agency's interpretation of a statute that it

is charged with administering is entitled to judicial deference.[14]  As explained by

the Court of International Trade:

> *Chevron* deference by judges to an administrative
> determination involves a several-step inquiry. "Step One
> of the *Chevron* analysis requires us to determine whether
> Congress has expressed an unambiguous intent using the
> traditional tools of statutory constructions [citations
> omitted].  If Congress has not unambiguously expressed
> its intent, *i.e.* when an agency's authority to act is not
> expressly authorized, further analysis is required.  So, for
> the agency to get *Chevron* deference for a policy, the
> question becomes whether the agency's action or
> presumption is based on a "permissible" construction of
> an identified statute (not a regulation).

*Jilin II*, 617 F. Supp. 3d at 1355-1356, Appx53.

It is thus clear that under *Chevron* and its progeny, deference to the agency

requires the agency to be interpreting an identified *portion* of the entire statute (and

not the entire wide-ranging antidumping statute itself).  *Id*.  Here, Commerce's

NME Policy has no statutory or even regulatory basis and is thus not entitled to

---

[14] Although *Chevron* is the seminal case involving deference and has been widely invoked by this Court over the past several decades, the Government remarkably ignores the case, failing to even cite it in its opening brief.  In fact, the CIT correctly noted that "[b]ecause Commerce makes no claim to *Chevron* deference and the First Remand Results identify no statutory source for the NME presumption, the court finds that the Department has conceded that there is no statutory source for the presumption." *Jilin II*, 617 F Supp. 3d at 1356.

157150345.1

*Chevron* deference. In its sole recognition of *Chevron*, the Government's brief states that "to the extent the NME Policy is construed as a statutory interpretation, as opposed to an exercise of administrative discretion, then the Court need only look to precedent and need not employ a *Chevron* analysis." App. Br. at note 6. Actually, the opposite is true. If the NME Policy requires a statutory interpretation, then *Chevron* does apply to the NME Policy and the Court must apply the *Chevron* analysis to the expansive antidumping duty statute (covering many aspects of the law that do not relate to non-market economies). Given that the Government has failed to identify any specific portion of the statute at issue in interpreting the lawfulness of the NME Policy, however, it is apparent that it is not entitled to any deference under *Chevron* and its progeny.

The only portion of the antidumping duty statute that deals directly with non-market economies is 19 U.S.C. § 1677(18)(B)(iv), (v), which "recognizes a close correlation between a non-market economy and government control of prices, output decisions, and the allocation of resources." *Jilin II*, 617 F. Supp. 3d at 1359-1360, Appx68 (*quoting Sigma*, 117 F.3d 1405-1406). Importantly, 19 U.S.C. 1677(18) may authorize Commerce to consider various factors in determining whether a foreign country operates on market-based principles, but it does not permit a presumption of government control like the NME Policy. The Court's prior decisions did not hold that deference to this portion of the

24

antidumping statute authorized the NME Policy. Nor has the Court engaged in a
*Chevron* analysis interpreting this portion of the statute to authorize the NME
Policy. This Court did not hold in *CMA, Diamond Sawblades*, or *Sigma* that this
statute provided the basis for Commerce's NME Policy; it merely recognized that
the statute considers certain factors when determining if a country is a non-market
economy. *See Sigma*, 117 F.3d at 1405-06; *CMA*, 1 F.4th at 1038-40; *see also
Diamond Sawblades*, 866 F.3d at 1312, 1314. Since *CMA*, the Court has not
performed any further analysis of the legality of the NME presumption or whether
it is entitled to deference.

It is well established that Commerce's authority to interpret the antidumping
statute is not without limit.[15] Further, this broad authority cannot possibly permit
Commerce to ignore its statutory mandate to calculate an individual rate for
mandatory respondents under 19 U.S.C. § 1677f-1(c)(2) in favor of an uncodified
policy with no statutory or regulatory basis. The Government cannot conjure
deference to its NME Policy solely from *Sigma* and the cases that relied on its
findings. The Supreme Court found in *Bowen v. Georgetown University Hospital*

---

[15] *See Fag Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002) (the fact that the statute does
not explicitly prohibit or deny Commerce the authority to conduct a duty absorption inquiry does not give
it authority to do so, and the statutory provisions governing annual reviews for Commerce do not confer
general authority that might include the power to consider duty absorption); *Duferco Steel, Inc. v. United
States*, 296 F.3d 1087, 1096 (Fed. Cir. 2002) (the Court of Appeals grants significant deference to
Commerce's own interpretation of the scope of antidumping duty and countervailing duty orders;
however, Commerce cannot interpret an antidumping order so as to change its scope, nor can it interpret it
in any manner contrary to its terms).

that *Chevron* deference did not apply to "agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice." *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 212 (1988). The Court further noted that its practice was to decline giving deference to an agency counsel's interpretation of a statute when the agency itself had no articulated position,[16] since Congress had delegated the administrative official, not its counsel, with the "responsibility for elaborating and enforcing statutory commands." *Id*. As in *Bowen*, Commerce's justifications for the NME Policy have arisen solely from litigation. Commerce has failed to provide any other basis for the NME presumption and without any statute or regulation interpreting the statute that policy is not entitled to any deference.

Commerce has repeatedly failed to provide a statutory or regulatory basis for the NME presumption when presented with the opportunity. In *Jilin I*, the CIT explicitly requested that Commerce explain how its NME Policy was in accordance with law with respect to Jilin and required that Commerce explain the specific regulatory or statutory support for the NME Policy. *Jilin I*, 519 F. Supp. 3d at 1247, Appx37. In its remand results, the only regulation the Government

---

[16] Again, as noted in Footnote 15, the CIT correctly noted that "[b]ecause Commerce makes no claim to *Chevron* deference and the First Remand Results identify no statutory source for the NME presumption, the court finds that the Department has conceded that there is no statutory source for the presumption." *Jilin II*, 617 F. Supp. 3d at 1356.

cited in support of the NME presumption is 19 C.F.R. § 351.107(d).  This

regulation permits Commerce to apply a single dumping margin for all exporters

and producers from a non-market economy country.  *Id*.  It does not, however,

codify or provide a basis for Commerce to apply a presumption that the export

activities of all firms within a NME country are subject to government control and

influence.  19 C.F.R. § 351.107(d).  This regulation is the closest Commerce has

ever come to actually codifying the NME Policy, but even it makes no mention of

a presumption of government control and influence within a NME country.  *Id*.  It

also does not provide Commerce with an exemption from its duty to calculate an

individual rate for mandatory respondents under 19 U.S.C.  § 1677f-1(c)(2).

Notably, the Government has never claimed that this regulation created or

provided the basis for its NME Policy.

In fact, the "single rate" regulation cannot be the source of the NME Policy

since the NME rebuttable presumption predated the adoption of the "single rate"

regulation.[17]  Further, Commerce disavowed any notion that this regulation was a

foundation for its NME presumption in the Federal Register commentary.

Commerce noted in its explanation of the regulation in May 1997:

---

[17] The commentary accompanying the adoption of the regulations show that the NME presumption existed prior to the regulation as "[f]our commenters suggested that the Department codify its *current* presumption of a single rate."  *See, e.g.*, *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,304 (Dep't Commerce May 19, 1997) (final rule) (emphasis added).

> We have decided not to codify the current presumption in favor of a single rate or the so-called "separate rates test," which outlines the type of information that an exporter or producer must present to obtain a separate rate. Because of the changing conditions in those NME countries most frequently subject to antidumping proceedings, this test (and the assumptions underlying the test) must be allowed to adjust to such changes on a case-by-case basis. The Department received comments proposing changes to the separate rates test, as well as objections to the proposed changes. Because we are codifying neither the single rate presumption nor the separate rates test, we are not addressing these comments at this time.

*Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. at 7,311 (emphasis added). While 19 C.F.R. § 351.107(d) may reference NME countries, it does not codify the NME presumption.

For over twenty years, Commerce has employed its NME Policy without properly codifying the presumption through notice-and-comment rule-making. It could have done so at any point. Instead, Commerce specifically disavowed creating a regulation for the policy.[18] Commerce has been rewarded for its lack of diligence, and has claimed, "broad authority to interpret the statute" and deference without the formalities required by the APA. Commerce has even wielded this "broad authority" to defy its statutory mandate to calculate an individual rate for mandatory respondents under 19 U.S.C. § 1677f-1(c)(2). Remarkably, Commerce

---

[18] *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7,311 Feb. 27, 1996).

157150345.1

has been able to use its uncodified NME Policy with no statutory basis to defy one of its fundamental statutory mandates.

It seems Commerce has apparently become so comfortable with its uncodified policy that it has not argued that there is a statutory or regulatory basis for the NME presumption either in this appeal or when specifically requested by the CIT.  *See Jilin II*.  In *Jilin II*, the trial judge specifically found that "Commerce here claims no statutory basis or regulatory basis for failing to individually determine Jilin's rate or for applying its NME presumption."  *Jilin II*, 617 F. Supp. 3d at 1368, Appx70.  Indeed, Commerce failed to cite either "statutory authorization or the single-rate regulation or any other regulation as the source for this denial."  *Id*.

As rightfully recognized by the CIT, "recent cases suggest that the wind is blowing against wide-ranging claims for deference."  *Jilin II*, 617 F. Supp. 3d at 1367, Appx69.  Even *Chevron* itself is under review by the Supreme Court.[19]   The Supreme Court has recently found in *West Virginia v. EPA* that it presumes that Congress intends to "'make major policy decisions itself, and not leave those decisions to agencies.'"  *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (*quoting U.S. Telecom Ass'n v. FCC*, 855 F. 3d 381, 419 (D.C. Cir. 2017); *see also*

---

[19] *Loper Bright Enters. v. Raimondo, No. 22-451 (*argued Jan. 27, 2024)*; Relentless Inc. v. Dep't of Commerce, No. 22-1219 (*argued Jan. 27, 2024)*.

157150345.1

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions – it does not, one might say, hide elephants in mouseholes.").

In short, the NME presumption is a major modification of the antidumping law that is tantamount to legislation. It is therefore not entitled to judicial deference without a proper statutory or regulatory basis.

## **CONCLUSION**

For these reasons, we respectfully request that this Court sustain the trial court's holding that the NME Policy is not entitled to deference and assign Jilin a zero percent antidumping duty rate based on its status as a mandatory respondent.

Respectfully submitted,

*/s/ Lizbeth R. Levinson*
Lizbeth R. Levinson
Brittney R. Powell


April 8, 2024                    Attorneys for Plaintiff-Appellee Jilin Forest
                               Industry Jinqiao Flooring Group Co. Ltd.

**FORM 19. Certificate of Compliance with Type-Volume Limitations**

Form 19<br>July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  23-2245

**Short Case Caption:**  Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  6,944  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 04/08/2024

Signature:  /s/ Lizbeth R. Levinson

Name:  Lizbeth R. Levinson

Save for Filing