No. 2023-2245

===

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

===

## JILIN FOREST INDUSTRY JINQIAO FLOORING GROUP CO., LTD.,
*Plaintiff-Appellee*

**v.**

## UNITED STATES,
*Defendant-Appellant*

---

Appeal from the United States Court of International Trade in No. 1:18-cv-00191-RKE, Senior Judge Richard K. Eaton

---

## REPLY BRIEF FOR DEFENDANT-APPELLANT

|  |  |
|---|---|
|  | BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General |
| COUNSEL: | PATRICIA M. McCARTHY<br>Director |
| Rachel Bogdan<br>Assistant Chief Counsel<br>Office of the Chief Counsel<br>for Trade Enforcement and<br>Compliance<br>U.S. Department of Commerce<br>Washington, D.C. | TARA K. HOGAN<br>Assistant Director<br><br>BRENDAN D. JORDAN<br>Trial Attorney<br>Civil Division, Department of Justice |
| Dated May 13, 2024 | *Attorneys for Defendant-Appellant* |

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................1

ARGUMENT....................................................................................3

   I.     Binding Precedent Compels Reversal Of The CIT's Judgment ............3

      A. The CIT Failed To Apply Binding Precedent..................................3

      B. Unless And Until Overturned, This Court Is Bound By *Sigma* And Its Progeny......................................................................................7

   II.    Commerce's Application Of Its NME Policy To Jilin Was Lawful....10

      CONCLUSION ........................................................................17

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page(s)**

*ArcelorMittal USA Inc. v. United States*,
    32 C.I.T. 440 (Ct. Int'l Trade 2008)...................................................................15

*Bechtel Nat'l, Inc. v. United States*,
    929 F.3d 1375 (Fed. Cir. 2019).......................................................... 8

*Carucel Invs. L.P. v. Vidal*,
    2023 WL 8888644 (Fed. Cir. Dec. 26, 2023)....................................................17

*Chevron, U.S.A., Inc. v. N.R.D.C., Inc.*,
    467 U.S. 837 (1984) ...........................................................2, 7, 13, 14

*China Manufacturers Alliance, LLC v. United States*,
    1 F.4th 1028 (Fed. Cir. 2021) .......................................................*passim*

*Diamond Sawblades Manufacturers Coalition v. United States*,
    866 F.3d 1304 (Fed. Cir. 2017).....................................................*passim*

*Hyundai Steel Co. v. United States*,
    19 F.4th 1346 (Fed. Cir. 2021) .............................................................13

*Mendenhall v. Cedarapids, Inc.*,
    5 F.3d 1557 (Fed. Cir. 1993) ............................................................ 4

*Mercier v. United States*,
    786 F.3d 971 (Fed. Cir. 2015)......................................................8, 10

*Newell Cos. v. Kenney Mfg. Co.*,
    864 F.2d 757 (Fed. Cir. 1988)......................................................... 8

*Pfizer Inc. v. Sanofi Pasteur Inc.*,
    94 F.4th 1341 (Fed. Cir. 2024) .....................................................16, 17

*Pokarna Engineered Stone Ltd. v. United States*,
    56 F.4th 1345 (Fed. Cir. 2023) ..........................................................14

*Qingdao Taifa Grp. Co. v. United States*,
   637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ...............................................11, 12

*Sigma Corp. v. United States*,
   117 F.3d 1401 (Fed. Cir. 1997)........................................................................*passim*

*SKF USA, Inc. v. United States*,
   512 F.3d 1326 (Fed. Cir. 2008).......................................................................... 7

*Smiley v. Citibank (S. Dakota), N.A.*,
   517 U.S. 735 (1996) .............................................................................................13

*Smith-Corona Grp. v. United States*,
   713 F.2d 1568 (Fed. Cir. 1983).................................................................12, 14

*Strickland v. United States*,
   423 F.3d 1335 (Fed. Cir. 2005)......................................................................... 7

*Torrington Co. v. United States*,
   68 F.3d 1347 (Fed. Cir. 1995)....................................................................12, 13

*United States Steel Corp. v. United States*,
   621 F.3d 1351 (Fed. Cir. 2010)........................................................................12

*United States v. Eurodif S.A.*,
   555 U.S. 305 (2009) ......................................................................................12, 14

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
   50 F.4th 98 (Fed. Cir. 2022) ............................................................................15

**Statutes**

5 U.S.C. § 553(b).......................................................................................................15

19 U.S.C. § 1673d.................................................................................................6, 9

19 U.S.C. § 1673d(c) .............................................................................................5. 9

19 U.S.C. § 1677(18) .............................................................................................11

19 U.S.C. § 1677f-1(c) ........................................................................ 5


**Regulations**

19 C.F.R. § 351.107(d) .........................................................................11


**Other Authorities**

*Issue,* BLACK'S LAW DICTIONARY (11th ed. 2019) .....................................6, 7


**Federal Register**

*Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012,*
  79 Fed. Reg. 26,712 (Dep't of Commerce May 9, 2014) ...................................16

*Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015,*
  82 Fed. Reg. 25,766 (June 5, 2017) ...............................................................16

*Multilayered Wood Flooring From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value,*
  76 Fed. Reg. 30,656 (Dep't of Commerce May 26, 2011) .................................16

*Multilayered Wood Flooring From the People's Republic of China,*
  76 Fed. Reg. 64,318, 64,321 (Dep't Commerce Oct. 18, 2011) .........................16

Defendant-appellant, the United States, respectfully submits this brief in
reply to the response brief filed by plaintiff-appellee, Jilin Forest Industry Jinqiao
Flooring Group Co., Ltd. (Jilin).  *See* Resp. Br. of Plaintiff-Appellee, April 8,
2024, ECF No. 23 (Resp.).

## INTRODUCTION

As we demonstrated in our opening brief, ECF No. 14 (Opening Br.), the
Court of International Trade erred in holding that Commerce's longstanding NME
Policy was unlawful.  In *Sigma Corp. v. United States*, this Court held that
Commerce possesses broad authority to enforce and administer the antidumping
statute and that Commerce's NME Policy is a rational and lawful exercise of that
authority.  117 F.3d 1401 (Fed. Cir. 1997).  This holding has been continuously
affirmed by "binding cases []too numerous to list in their entirety" in the 27 years
since *Sigma* was decided.  *See China Manufacturers Alliance, LLC v. United States*
(*CMA*), 1 F.4th 1028, 1036 (Fed. Cir. 2021).  The trial court was required to abide
by the doctrine of *stare decisis* and apply these binding precedents sustaining the
lawfulness of Commerce's NME Policy in this case.  The trial court failed to do so
and therefore committed reversible error.

We further demonstrated in our opening brief that Commerce's decision to
apply its NME Policy to Jilin was reasonable and supported by substantial
evidence.  In its remand results, Commerce explained the NME Policy's function

1

as an evidentiary presumption, the statutory and regulatory sources that support this policy, and the logical reasons for having such a policy.  Therefore, even if this Court were free to ignore *Sigma*, *Diamond Sawblades*, *CMA* (and it is not), the trial court's decision should still be reversed.

In its response, Jilin fails to rebut the arguments we made in our opening brief.  Jilin argues that *stare decisis* does not apply because *Sigma* and other binding precedent did not respond to the specific reasoning offered by the trial court in this case.  However, Jilin misunderstands *stare decisis*, which posits that judgments on issues of law are binding on future cases before this Court and on the trial court.  The issue of whether Commerce's NME Policy is lawful and authorized by the statute has already been decided by this Court and affirmed multiple times.  Jilin's misunderstanding of this Court's previous holdings and the doctrine of *stare decisis* causes its argument to contain a number of logical contradictions and request that this Court re-decide a legal question that this Court has already definitively resolved.

Jilin also mistakenly argues that Commerce's NME Policy cannot survive because it does not deserve *Chevron*[1] deference.  However, Commerce's NME Policy is an evidentiary practice, not a statutory interpretation.  Therefore, *Chevron* deference is not the correct framework to assess the lawfulness of the NME Policy.

---

[1] *Chevron, U.S.A., Inc. v. N.R.D.C., Inc.*, 467 U.S. 837 (1984).

Jilin also argues for the first time that Commerce's NME Policy should have been the subject of notice and comment rulemaking. However, Commerce's NME Policy is not a legislative rule and Jilin cannot claim that it failed to receive notice of the NME Policy or that it was prejudiced by the manner in which Commerce informed Jilin of the NME Policy. And finally, Jilin does not challenge our argument that substantial evidence supports Commerce's determination that Jilin is not independent of Chinese government control.

Accordingly, this Court should reverse the judgment of the trial court.

## ARGUMENT

## I.     Binding Precedent Compels Reversal Of The CIT's Judgment

This Court's decisions in *Sigma*, *Diamond Sawblades*, *CMA*, and other "binding cases []too numerous to list in their entirety" compel this Court to reverse the trial court's decision, which held that Commerce's longstanding NME Policy is unlawful. *See CMA*, 1 F.4th at 1036.

### A.     The CIT Failed To Apply Binding Precedent

As we explained in our opening brief, the trial court failed to follow this Court's precedent, erroneously reasoning that the precedent was not binding because it was not factually *identical* to this case. *See* Opening Br. at 27-28; Appx68. The doctrine of *stare decisis* is broad in scope and posits that this Court's judgments on an *issue of law* are binding on future cases before this Court and on

3

lower court cases over which this Court possesses appellate jurisdiction. *See Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993). The trial court cited no authority, and we are aware of none, for the proposition that this Court's answers to questions of law are not binding on a trial court if the case before the trial court is not factually identical to precedential authority from this Court.

Jilin, in its response brief, does not identify a meaningful factual distinction between this case and *CMA*, or any other binding precedents. Nor does Jilin attempt to defend the trial court's erroneous reasoning that cases must be factually identical for *stare decisis* to apply.

Jilin nevertheless argues in its response brief that *stare decisis* does not apply in this case. *See* Resp. at 18. Jilin reasons that this is so because *Sigma*, and other binding precedent affirming the lawfulness of Commerce's NME Policy, did not "engage[] in an analysis of the legal questions posed by this appeal - namely, whether the NME presumption is lawful in the absence of specific statutory or regulatory authority and in the absence of any rule-making procedures under the APA." *Id*. However, this Court in *Sigma* already resolved the question of whether the NME Policy is "authorized" and the source of the legal authority for Commerce to employ its NME Policy.

The Court in *Sigma* held that the source for Commerce to employ "a presumption of state control" is its "broad authority . . . to carry out the statutory mandate" of the antidumping duty statute.  117 F.3d at 1405.  The statute confers upon Commerce the responsibility to determine and calculate dumping margins for respondents.  *See* 19 U.S.C. §§ 1673d(c)(1)(B)(i)(I); 1677f-1(c)(1).  The NME Policy is the manner in which Commerce carries out this responsibility with respect to firms from NME countries.  Thus, this Court has resolved the question of the statutory source and authority for Commerce's NME Policy.  Jilin may disagree with this Court's conclusion that the NME Policy is statutorily authorized, but it cannot deny that this Court has already answered this legal question of the source of Commerce's authority to employ its NME Policy.

Jilin's argument also misunderstands the legal issues or legal questions that *Diamond Sawblades*, *CMA*, and *Sigma* decided.  As discussed above, the legal issue decided by this Court's *Sigma* decision that the trial court was obligated to follow is that Commerce's NME Policy is a lawful exercise of its authority to calculate a dumping margin for a respondent in accordance with the statute.  *Sigma*, 117 F.3d at 1405.  In the 27 years since this Court decided *Sigma*, this Court has resolved numerous legal questions regarding the lawfulness of Commerce's application of its NME Policy in particular scenarios.

For example, in *Diamond Sawblades*, this Court held that Commerce's NME Policy can lawfully apply even where a mandatory respondent from an NME country is fully cooperative with Commerce's review and the NME-wide rate is based on adverse facts available. *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1312–15 (Fed. Cir. 2017). In *CMA*, this Court held that when Commerce assigns an NME-wide rate to a mandatory respondent per its NME Policy, Commerce satisfies its obligation to calculate an individual rate as required by 19 U.S.C. § 1673d. 1 F.4th at 1039. Accordingly, prior to the trial court's opinion and order, this Court had definitively resolved the legal questions of whether Commerce's NME Policy was lawful and authorized by the statute, whether Commerce can lawfully apply its NME Policy to a cooperative mandatory respondent who fails to rebut the presumption of NME government control, and whether Commerce fulfills its obligation to calculate a rate for a mandatory respondent when it assigns the mandatory respondent the NME-wide rate in accordance with its NME Policy. The trial court arrived at different answers to these definitively resolved questions of law and therefore contravened binding precedent.

Jilin also conflates the concept of a decided "legal issue" with the trial court's reasoning or explanation for its decision. Black's Law Dictionary defines a "legal issue" as a "discrete question of law." *Issue*, BLACK'S LAW

6

DICTIONARY (11th ed. 2019). In its opinion and order, the trial court offered explanations as to why its answer to the question of whether Commerce's use of its NME Policy is a lawful exercise of its discretion under the statute was correct. Specifically, the trial court explained that Commerce failed to identify a statutory source for its NME Policy and that Commerce's NME Policy was not entitled to *Chevron* deference. *See*, *e.g.*, Appx49-54. However, these were *reasons* the trial court advanced in support of its answer to the question of whether Commerce is legally authorized to employ its NME Policy in antidumping and countervailing duty reviews.

Even if the trial court's reasoning and explanations for its decision were entirely novel, that does not change the fact that the trial court's opinion and order provided answers to settled questions of law differently from how this Court previously answered such questions. If the trial court disagreed with this Court's answer to the question of whether Commerce's NME Policy is statutorily authorized and lawful, it was free to offer its own explanations and reasoning and urge revision *en banc*. *See Strickland v. United States*, 423 F.3d 1335, 1338 n.3 (Fed. Cir. 2005). The trial court's evident "disagreement," however, "do[es] not justify . . . ignoring binding precedent." *SKF USA, Inc. v. United States*, 512 F.3d 1326, 1331 (Fed. Cir. 2008). Because the trial court did so, it must be reversed.

### B. Unless And Until Overturned, This Court Is Bound By *Sigma* And Its Progeny

Not only are *Sigma*, *Diamond Sawblades*, *CMA*, and other decisions of this Court affirming the legality of Commerce's NME Policy binding on the trial court, they are binding on this Court as well. *See Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir. 1988) ("This court has adopted the rule that prior decisions of a panel of the court are binding precedent on subsequent panels unless and until overturned *in banc*."). Accordingly, even if the trial court somehow did not contravene binding precedent, this Court is bound to follow *Sigma* and its progeny, which have affirmed the lawfulness of Commerce's NME Policy. *Id.*; *see also Bechtel Nat'l, Inc. v. United States*, 929 F.3d 1375, 1381 (Fed. Cir. 2019); *Mercier v. United States*, 786 F.3d 971, 981 (Fed. Cir. 2015).

Jilin argues that this Court is not bound by *Sigma, CMA*, and the other cases because these decisions did not address "why an uncodified policy should be given more deference than the statutory provision requiring Commerce to determine the 'individual weighted average dumping margin for each know exporter . . .'" Resp. at 18-19. As explained above, this Court has squarely resolved the issue of whether the NME Policy is a rational exercise of Commerce's discretion to calculate a dumping margin where a cooperative mandatory respondent from an NME country fails to rebut the presumption of government control. *See* pp. 6, *supra*.

8

Further, this Court's decision in *CMA* made clear that there is no conflict between Commerce's NME Policy and the "the statutory provision requiring Commerce to determine the 'individual weighted average dumping margin for each know exporter.'" *CMA*, 1 F.4th at 1039 ("We now confirm that the resulting country-wide NME entity rate may be an "individually investigated" rate within the meaning of 19 U.S.C. § 1673d(c)(1)(B)(i)(I) . . ."); 19 U.S.C. § 1673d (Commerce "shall . . . determine the estimated weighted average dumping margin for each exporter and producer individually investigated"). Thus, the question of whether Commerce's NME Policy is owed more weight than its obligation to calculate an individual dumping margin under the statute, has already been resolved by this Court.

Jilin's argument is also internally inconsistent and distorts the holdings of binding caselaw. For example, Jilin argues that *Sigma*'s discussion of Commerce's "broad authority" to devise procedures to carry out its statutory mandate is non-binding "dicta," but also argues that this Court has upheld the NME Policy "*based solely on* Commerce's ill-defined 'broad authority'" and that this Court's deference of that "broad authority" was "dispositive" in *Sigma*, *Diamond Sawblades*, *CMA*, and other cases. *See* Resp. at 10-13 (emphasis added). This Court's decisions that repeatedly affirmed Commerce's NME Policy based on Commerce's authority to implement the statute cannot be both "dicta" and "dispositive."

9

Similarly, Jilin argues that this Court can both affirm the trial court and still honor *Diamond Sawblades* and *CMA*. *See* Resp. at 19. However, accepting Jilin's argument would require this Court to either ignore or overturn *Sigma*, *Diamond Sawblades*, *CMA*, and "binding cases []too numerous to list in their entirety," *CMA*, 1 F.4th at 1036. Because this Court cannot overturn these cases without sitting *en banc*, the Court must reverse the trial court's judgment. *See Mercier*, 786 F.3d at 981 ("In the absence of authority from the Supreme Court, this [C]ourt could only overrule . . . [a] line of cases [if] were we to sit *en banc*.").

## II.    Commerce's Application Of Its NME Policy To Jilin Was Lawful

In its response, Jilin does not request *en banc* referral and simply seeks to distinguish this case from the *Sigma* line of cases, where this Court has continuously upheld the lawfulness of Commerce's NME Policy. However, Jilin's attempt to distinguish this case is unavailing. A straightforward application of 27 years of binding precedent should result in the reversal of the trial court's decision. Nevertheless, even if this Court were free to ignore its previous cases affirming Commerce's NME Policy, the Court should still reverse the trial court's judgment. The NME Policy is an evidentiary practice that Commerce employs in its administration of the antidumping duty statute. Because Commerce is afforded wide discretion in how it administers the statute, and because the NME Policy is not an abuse of that discretion, the trial court erred in finding that the NME Policy

10

was unlawful.

First, Commerce's NME Policy is not an uncodified regulation or statutory interpretation, as the trial court suggested, but is an evidentiary practice Commerce employs when determining dumping margins for respondents from NME countries. *See* Opening Br. at 30 (citing Appx173-176). In NME proceedings, Commerce uses a rate established for the country-wide entity, which it applies to all imports from an exporter that has not established its eligibility for a rate separate from the NME-entity. *See* 19 C.F.R. § 351.107(d).

The NME Policy places the evidentiary burden of showing independence from the country-wide entity on the parties who have the best access to this information. *Sigma*, 117 F.3d at 1406. Placing the burden in this manner is consistent with Commerce's authority to apply a single country-wide rate in NME proceedings and helps ensure that Commerce attains the most accurate rate possible for exporters from NME countries. Commerce's calculation of a dumping margin through its NME Policy also helps avoid the paradoxical situation where a firm controlled by an NME-entity has a different rate from the NME-entity itself. *See* Opening Br. at 30; Appx182. In NME countries, prices and costs are not reliable in determining the fair value of merchandise within the meaning of 19 U.S.C. § 1677(18) given the level of intervention by NME governments in setting relative prices. *See Qingdao Taifa Grp. Co. v. United States*, 637 F. Supp. 2d

11

1231, 1243 (Ct. Int'l Trade 2009). By placing the evidentiary burden on the respondent to show independence from the NME government, the NME Policy is thus attuned to the realities of governmental and business operations in countries where Commerce has determined that the economy does not broadly operate according to market principles.

Given the NME Policy's function as an evidentiary presumption, the wide latitude that Congress has provided Commerce to enforce and implement the statute is a sufficient "source" or "authority" for the NME Policy. *See United States Steel Corp. v. United States*, 621 F.3d 1351, 1361 (Fed. Cir. 2010); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009); *Sigma*, 117 F.3d at 1405. Indeed, this Court has recognized that in matters of enforcement and execution of the statute, Commerce enjoys broad deference. *See Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983) ("The Secretary of Commerce . . . has been entrusted with responsibility for implementing the antidumping law. The Secretary has broad discretion in executing the law"); *see also Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) (observing that as a "general principle . . . agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources."). *Sigma* applied this pre-existing general principle regarding Commerce's broad authority over implementation of the statute to the NME Policy. *See Sigma*, 117 F.3d at 1405

12

(citing *Torrington*, 68 F.3d at 1351)).

Jilin, like the trial court, mistakenly treats this evidentiary practice as an exercise of statutory interpretation. Based on this misunderstanding, Jilin places undue emphasis on whether the NME Policy should be analyzed under the *Chevron* framework. *See* Resp. at 23 n.14 (Jilin observing that it is "remarkabl[e]" that our opening brief did not rely on *Chevron*); Appx52-54; *see also* Resp. at 12-13 (Jilin arguing that "the *Chevron* doctrine is only applicable where the interpretation of a statute is at issue (and therefore is not relevant here).").

Jilin is correct that "the *Chevron* doctrine is only applicable where the interpretation of a statute is at issue." *Id.*; *see also Hyundai Steel Co. v. United States*, 19 F.4th 1346, 1352 (Fed. Cir. 2021) (describing *Chevron*'s two-step inquiry, which this Court employs "[w]hen evaluating an agency's interpretation of a statute."). Indeed, "the whole point of *Chevron* is to leave the discretion provided by the *ambiguities* of a statute with the implementing agency." *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (emphasis added). *Chevron* does not apply in this case, because Commerce, in implementing its NME Policy, was not attempting to interpret the statute or resolve ambiguities of the statute; rather, it was carrying out its duty to calculate accurate rates for mandatory respondents. Jilin, like the trial court, offers no authority for the proposition that an evidentiary presumption, such as the NME Policy, can only be sustained if it

13

warrants *Chevron* deference.[2]  And we are aware of none.  Further, even if the

NME Policy is deemed to be an exercise of statutory interpretation as opposed to

an evidentiary practice, this Court has already found the NME Policy to be

consistent with the statute, thus rendering a *Chevron* analysis unnecessary  *See*

*Pokarna Engineered Stone Ltd. v. United States*, 56 F.4th 1345, 1350 (Fed. Cir.

2023) (noting that the court "need not employ a *Chevron* analysis . . . because our

precedent has already interpreted" the statutory language in question).

Although Commerce's authority to administer the statute is broad, it is not

"unlimited" as Jilin suggests, as Commerce is charged with carrying out this

authority without acting irrationally, arbitrarily, capriciously, or abusing its

discretion.  Resp. at 11; *Smith-Corona*, 713 F.2d at 1571.  As discussed above and

in our opening brief, the NME Policy is a rational way for Commerce to accurately

determine the dumping margin of a firm from an NME country and there is no

express statutory mandate prohibiting Commerce from calculating a dumping

margin using its NME Policy.  *See* Opening Br. at 19-20; *CMA*, 1 F.4th at 1039

---

[2]  Notably, this Court has long held that Commerce is afforded broad discretion in its implementation and execution of the antidumping duty statute.  *See Smith-Corona*, 713 F.2d at 1571.  Such deference to Commerce's means of administering the statute has existed prior to, and independent of, the Supreme Court's 1984 *Chevron* decision.  *Id*. (Federal Circuit case decided in 1983); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (observing that *Chevron* provided agencies such as Commerce with *interpretative* authority and deference over matters of interpretation when a statute is ambiguous.).

(Commerce can lawfully determine the estimated weighted average dumping margin for each exporter and producer individually investigated through its NME Policy). Accordingly, Commerce's application of the NME Policy to Jilin is not an abuse of the broad discretion that Commerce exercises when administering the antidumping duty laws.

For that reason, Jilin is also mistaken that Commerce's NME Policy could only be sustained if it was the product of notice and comment rulemaking. *See* Resp. at 13. Certain proposed "legislative rules" must be promulgated through notice-and-comment rulemaking, but that requirement does not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b); *see also Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 105 (Fed. Cir. 2022). Thus, for example, this Court has held that Commerce's control number-specific reporting requirement is not subject to the notice-and-comment rulemaking provisions of the Administrative Procedures Act, despite the fact that the reporting requirement is critical to accurately determining the cost of subject merchandise, because it "reflects a statement of policy rather than the agency's explicit invocation of general legislative authority." *Id.*; *see also ArcelorMittal USA Inc. v. United States*, 32 C.I.T. 440, 464 (Ct. Int'l Trade 2008) (holding that policy statements, even where comments were requested, were not binding rules). Commerce's NME

Policy is a statement of policy and practice, not a legislative rule, and therefore is not required to be implemented through notice and comment rulemaking.

Nevertheless, even if the NME Policy "was not exempt from notice-and-comment rulemaking, any error by [Commerce] in that regard would be harmless absent a showing of prejudice by [Jilin]." *Pfizer Inc. v. Sanofi Pasteur Inc.*, 94 F.4th 1341, 1354 (Fed. Cir. 2024). Jilin was specifically advised in Commerce's initiation notice for the administrative review that it had to demonstrate independence from the Chinese government in order to receive a rate other than the NME-wide rate. *See* Multilayered Wood Flooring From the People's Republic of China, 76 Fed. Reg. 64,318, 64,321 (Dep't Commerce Oct. 18, 2011) (Final Determination); Appx74. Thus, Jilin was notified of Commerce's NME Policy. Jilin does not claim that it was unaware of Commerce's longstanding NME Policy[3], nor does Jilin explain how receiving actual notice of Commerce's NME

---

[3] Indeed, Jilin cannot credibly claim that it was unaware of Commerce's NME Policy in light of its more than decade-long participation in segments of the multilayered wood flooring from China antidumping duty proceeding, within which Commerce has consistently applied a presumption of state control. *See*, *e.g.*, *Multilayered Wood Flooring From the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 30656, 30660, 30665 (Dep't of Commerce May 26, 2011); *Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 26712, 26714 (Dep't of Commerce May 9, 2014); *Multilayered Wood Flooring From the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Partial Rescission of Antidumping Duty Administrative Review; 2014-2015*, 82 Fed. Reg. 25,766, 25,767 (June 5, 2017).

Policy through Commerce's longstanding publicly-announced practice, the initiation notice, and questionnaire, as opposed to informal rulemaking, was prejudicial. *See Pfizer*, 94 F.4th at 1353-54; *see also Carucel Invs. L.P. v. Vidal*, 2023 WL 8888644, at *9 (Fed. Cir. Dec. 26, 2023). Accordingly, Jilin cannot demonstrate prejudicial error as the party challenging Commerce's action.

## <u>CONCLUSION</u>

For these reasons, and for the reasons stated in our principal brief, we respectfully request that this Court reverse the judgment and remand this matter to the trial court with an instruction to sustain the 25.62 percent antidumping duty rate Commerce assigned to Jilin as part of the NME entity.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

Of Counsel:

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

Rachel Bogdan
Assistant Chief Counsel
Office of the Chief Counsel
for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

/s/ Brendan D. Jordan
BRENDAN D. JORDAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 616-0342
Email: Brendan.d.jordan@usdoj.gov

May 13, 2024

*Attorneys for Defendant-Appellant*

<u>CERTIFICATE OF COMPLIANCE</u>

I certify that, pursuant to Fed. R. App. Procedure 32(g), this motion complies with the type-volume limitation. This brief was prepared using Microsoft Word, Times New Roman, 14-point font. In making this certification, I have relied upon the word count function of the Microsoft Word software application used to prepare this motion. According to the word count, this motion contains 3955 words.

<u>/s/ Brendan D. Jordan</u>